Filed 8/8/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAGNY KNUTSON,<br><br>    Plaintiff and Appellant,<br><br>       v.<br><br>RICHARD J. FOSTER,<br><br>    Defendant and Appellant. | G054247<br><br>(Super. Ct. No. 30-2014-00745266)<br><br>O P I N I O N |

Appeals from a postjudgment order of the Superior Court of Orange County, Theodore R. Howard, Judge. Reversed and remanded with directions.

Corsiglia McMahon & Allard, Mark J. Boskovich and B. Robert Allard for Plaintiff and Appellant.

Tracy L. Anielski for Defendant and Appellant.

\*        \*        \*

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.C., III., IV., V., VI., and VII.

INTRODUCTION

After a three-week trial, the jury found in favor of Dagny Knutson on her fraudulent concealment and intentional breach of fiduciary duty claims against her former attorney, Richard J. Foster, and awarded her economic and noneconomic damages. The trial court granted Foster's motion for a new trial on the grounds that Knutson did not prove Foster's conduct was the cause of Knutson's damages and that Knutson had failed to offer substantial evidence of her emotional distress damages.

We reverse and reinstate the jury's verdict because the motion for a new trial was granted on erroneous legal theories. We partially publish this opinion for two reasons. First, we hold that claims of fraudulent concealment and intentional breach of fiduciary duty by a client against his or her attorney are subject to the substantial factor causation standard, not the "but for" or "trial within a trial" causation standard employed in cases of legal malpractice based on negligence. The fact that an attorney-client relationship existed between the plaintiff and the defendant does not change the method by which the plaintiff must establish causation in cases of intentional torts.

Second, we hold that in a case such as this, where the plaintiff's emotional distress consisted of anxiety, shame, a sense of betrayal, and a continuing impact on personal relationships, the testimony of the plaintiff alone is sufficient to support emotional distress damages. Knutson's testimony that the contract negotiated by Foster, and which he encouraged her to enter, led to stress and extra pressure that made swimming an emotionally painful activity, that she felt shamed and betrayed when she learned about Foster's duplicitousness, and that her personal relationships have been impacted due to her lack of trust in others, was sufficient to establish her damages in the absence of any expert testimony.

2

STATEMENT OF FACTS

A.

*KNUTSON, A RISING SWIMMING STAR, ENTERS AN ORAL AGREEMENT WITH USA SWIMMING'S HEAD COACH.*

As a high school student in North Dakota, Knutson was an internationally ranked swimmer. She was named high school swimmer of the year by Swimming World Magazine in her junior and senior years of high school. As a high school junior, she broke the American record in the 400-meter individual medley. She was ranked 16th in the world in the 200-meter freestyle, and 22nd in the world in both the 400-meter freestyle and the 200-meter individual medley.

In her senior year of high school (2009-2010), Knutson received scholarship offers from many universities with top swimming programs. All offered five-year packages without any type of performance markers. She committed to Auburn University because one of its coaches, Paul Yetter, was considered an expert in the individual medley, Knutson's specialty event.

In March 2010, Mark Schubert, USA Swimming's head coach, told Knutson that Yetter was leaving Auburn University. Schubert advised Knutson to swim professionally rather than at Auburn or another university. He orally promised her support to train at a "Center for Excellence" formed by USA Swimming in Fullerton, California, including room, board, tuition, and a stipend until she earned her degree. Knutson, her parents, and her coaches were present when Schubert made this offer; all of them agreed Schubert's offer did not include any performance markers, was not subject to Schubert's evaluation, and was to last through 2016, after the Rio de Janeiro Olympic Games. The agreement was entirely oral; no written agreement was made between Knutson and USA Swimming or Schubert at that time. Knutson ultimately accepted Schubert's offer and moved to Fullerton.

3

At Schubert's suggestion, Knutson retained Evan Morgenstein, through his company Premier Management Group LLC (PMG), to be her sports agent. She turned professional, accepted prize money, and signed an endorsement agreement with Mutual of Omaha. Morgenstein's standard athlete representation agreement was signed by Knutson's mother, but never by Knutson herself.

## B.

### KNUTSON RETAINS ATTORNEY FOSTER WHEN USA SWIMMING REFUSES TO HONOR THE ORAL AGREEMENT.

A few months after Knutson moved to Fullerton, Schubert's employment was terminated by USA Swimming. Schubert told Knutson not to worry, and assured her that USA Swimming would keep the promises he had made to her. However, Knutson became concerned because she was not receiving any money from USA Swimming.

At Morgenstein's suggestion, Knutson retained attorney Richard Foster to represent her in an attempt to get USA Swimming to honor the oral agreement made by Schubert. Foster was well-connected within the swimming world. At the time he represented Knutson, Foster was on the water polo technical committee for the Fédération Internationale de Natation (FINA), the international governing body for swimming, diving, water polo, and synchronized swimming. Foster had been president of the governing body for United States Aquatic Sports (USAS) from 2006 through 2010. (USAS is the umbrella agency that interacts with FINA on behalf of aquatic sports organizations in the United States, including USA Swimming.) Foster was the past-president of USA Water Polo, and had been the chairperson of the organizing committee for the 2004 U.S. Olympic swim trials. Foster was the vice-president and an executive council member for the Swimming Union of the Americas (ASUA), a continental aquatics association, from 2003 to 2007.

4

At the time he represented Knutson, Foster considered himself to be a high-level person within the aquatics industry and had on-going relationships with and access to many leaders at USA Swimming. Foster did not disclose to Knutson these close personal ties, or that he had long-time relationships with FINA, USA Swimming, and other swimming organizations.

Foster had represented Schubert in 2006 in reviewing Schubert's contract as USA Swimming's head coach. When USA Swimming fired Schubert in 2010, Foster refused to represent him in a wrongful termination lawsuit against USA Swimming because he did not want to have a negative relationship with USA Swimming in the future. Foster told Schubert at that time that he would have a conflict of interest in suing USA Swimming. Knutson testified that Foster never told her that he represented Schubert in 2006, or that he declined to represent Schubert against USA Swimming because he felt there was a conflict of interest due to his relationships with people within USA Swimming. For his part, Foster testified he told both Knutson and Morgenstein that if Knutson could not settle the dispute with USA Swimming, Foster would help her find another attorney to bring a lawsuit on her behalf.

Had Knutson known that Foster had previously represented Schubert, or had she known of Foster's personal and professional relationships with USA Swimming, she would not have agreed to let him represent her "[b]ecause he has both sides' interest at heart, not just mine."

C.

*FOSTER NEGOTIATES A SETTLEMENT WITH USA SWIMMING ON BEHALF OF KNUTSON.*

On behalf of Knutson, Foster sent an e-mail to Chuck Wielgus, USA Swimming's Executive Director, on November 10, 2010, asking Wielgus to confirm that USA Swimming would abide by Schubert's oral agreement to pay for Knutson's tuition, room and board. Wielgus sent Foster an e-mail on the same day, stating, "Let's not let

this escalate." Foster responded, "I don't want this to escalate either." Foster never told Knutson that he had made this statement.

In another e-mail dated November 11, Wielgus responded that Schubert did not have the authority to make any such promises to Knutson, that Schubert had never made anyone else at USA Swimming aware of any such promises, and that USA Swimming's budget for the years in question had not been approved. Wielgus claimed there was no evidence of a written or oral agreement with Knutson and didn't even know if there was anything in the budget to pay her.

Foster suggested that Richard Young, USA Swimming's general counsel, speak directly with Schubert, who confirmed that there was, in fact, an agreement with Knutson and that she was to be paid through grants or out of a discretionary fund that Schubert controlled as the national team head coach. Schubert told Young that the agreement was to run through the 2012 Olympics in London, and that Schubert would consider extending the agreement based on Knutson's performance there. At this point the parties were far apart, with Young insisting on a deal only through 2012 and Foster demanding a deal through 2016.

Although Foster believed that the "bargaining chip for the whole negotiation period [was] that we could go to the press," he also believed that taking the story to the press would cause USA Swimming to want to pursue litigation. Foster never suggested to Knutson the possibility of involving or threatening to involve the press as a bargaining tool.

Foster testified he did not think Knutson was "in a position to go through a couple of years of litigation" and did not believe she would succeed in litigating against USA Swimming because the oral contract would be barred by the statute of frauds. However, Foster knew that Knutson detrimentally relied on the promises Schubert made by, among other things, giving up her chance to go to Auburn, becoming a professional swimmer, and moving to Fullerton.

6

In an e-mail dated November 16, 2010 to Foster, Wielgus stated: "STRICTLY CONFIDENTIAL—PLEASE JUST KEEP BETWEEN YOU AND ME [¶] These situations are extremely disconcerting . . . and we will do our best to work through them. [¶] Confidentially, I have posed the following questions to Bruce Stratton, Jim Wood and Rich Young. [¶] 1. What is our position when we meet with Kate Ziegler next Monday morning?[1] (Given that whatever we do with Kate will certainly be precedent-setting with Dagny.) [¶] 2. When Mark made promises that he had no authority to make, is USA Swimming still responsible for fulfilling those promises? [¶] 3. Can any of this be used in the settlement discussions with Mark's attorney? Specifically, can we back out from any agreed-to settlement amount the actual expenses that USA Swimming would incur i[f] we fulfilled Mark's promises to Kate and Dagny (and potentially others)? [¶] 4. Mark's actions would seem to evidence a recruiting violation (Section 304.1.13 of the Code of Conduct) . . . should we take action on this? Will this be construed as retaliatory by his attorney? [¶] All this business with Mark is just so depressing." While Foster forwarded Wielgus's e-mail to Morgenstein with the notation "[k]eep this confidential so that I can stay in confidence with Chuck," he never made Knutson aware of Wielgus's communication.

Foster responded to Wielgus's November 16 e-mail: "As you know, I represent a lot of athletes, including a fairly large group of swimmers. It is rare that an issue arises between my clients and USA Swimming. If an issue comes up, I will discuss it with you in hopes of resolving the issue. I won't however get involved with litigation against USA Swimming. I have too many friends in your organization, including you." Foster had never informed Knutson in writing that he would not continue his representation of Knutson if there was a lawsuit against USA Swimming. Knutson herself testified that Foster never informed her about this at all.

---

[1] Ziegler was another promising young swimmer to whom Schubert had also made oral promises of support by USA Swimming.

7

On November 17, Wielgus sent Foster an e-mail stating that "USA Swimming should fulfill the promises that Mark made to . . . Dagny, regardless of whether or not he had the authority to make such promises." Wielgus asked Foster to provide him with "a written summary of exactly what . . . Dagny's mom believe[s] was promised to them by Mark, along with their very best estimate and expectation as to the full extent of the financial commitment that USA Swimming would have to . . . them," so Wielgus could present the information to USA Swimming's board of directors. In late November, the USA Swimming board of directors approved a motion that the organization would "make good" on Schubert's promises to Knutson regarding living expenses and tuition, with the details to be worked out and approved by Wielgus. Wielgus advised Foster that Young would be confirming with Schubert the terms of the agreement claimed by Knutson. Wielgus also noted that any final agreement would have timetables and performance markers or metrics.

In an e-mail to Young on January 25, 2011, Foster stated that Schubert had told Knutson, her parents, her previous coach, and others that USA Swimming "would pay her room, board, tuition and books through the Olympics in 2016. . . . Dagny is a bit furious because she says it would be absurd to leave a 5[-]year scholarship [at Auburn or another university] to come to California for a two[-]year scholarship." Later that same day, Foster sent Young another e-mail stating: "Dagny and her mother are adamant. The deal was through the 2016 Olympics. They want a response asap and are willing to file suit if the deal is not honored. (Again, I would not handle that suit)."

On February 4, 2011, Young e-mailed Foster: "Mark [Schubert] could not have been more clear that he did not give Dagny an unconditional commitment through the 2016 Olympic Games. Rather, USA Swimming's funding to her would be based on her continued high level of performance. Mark was equally clear that the evaluation of Dagny's performance and continued support was to be made by him as Head Coach and National Team Director. However, if Dagny would prefer to have USA Swimming's

8

post-2012 support tied down with identified performance criteria (e.g., continuous annual FINA top 25 world ranking in an Olympic event), USA Swimming would be open to tying down that criteria now."

On March 15, 2011, Foster e-mailed Knutson to inform her that USA Swimming was willing to settle the matter on the following terms: (1) assist Knutson financially by getting her out of her lease in California and paying for one flight to Florida; (2) pay her tuition from January 2011 through December 2012; (3) pay her $1,000 per month in athlete support through June 2011; and (4) pay her tuition and support after 2012 through 2016 if she was in the top 25 in the world in an Olympic event based on FINA's September ranking.

Knutson responded on March 16 explaining, inter alia, that the performance marker "isn't good because it adds pressure for me to do something for USA Swimming when all they've done is negatively affected my career." Foster forwarded this attorney-client privileged document to Young at USA Swimming.

On March 19, Foster sent an e-mail to Knutson and Morgenstein, stating that a performance marker "is not unreasonable" but should be modified to apply if Knutson were "top 25 in the world *or top 3 in the U.S.*" (Italics added.) The e-mail also stated: "At this point, I don't think a lawsuit is advisable. While we may get more money for Dagny, the attorneys' fees would eat up the difference in our proposal and the current counter-proposal.[2] Also, filing suit against USA Swimming could have a negative impact on Dagny's ability to acquire future endorsement contracts." Knutson believed Foster's representation that this was the best deal she could expect to receive, and believed she had no choice but to accept the offer if she wanted to keep swimming.

Foster did not consult with any expert before making this recommendation regarding performance markers to Knutson. Rather, he relied on Morgenstein, despite

_____

[2] At no time had Foster explained to Knutson that she might be able to find an attorney to sue USA Swimming on a contingency fee basis.

9

the fact that as a sports agent, Morgenstein stood to benefit from a performance marker because it would give incentive to Knutson to perform well and he would make money on endorsement deals. Foster made no inquiries to learn what percentage of collegiate swimmers had ever met the specified performance marker even once, much less over a continuous five-year period, before advising Knutson to accept it. Foster hired no investigator or expert while representing Knutson, did not interview a single witness other than Knutson herself, including Knutson's coaches and mother, who were present when Schubert made the promises. Foster never even met Knutson until her deposition was taken in the present case.

Foster's April 2, 2011 e-mail to USA Swimming stated, "We will agree to a performance standard, even though no such standard was discussed. However, we would like to make it top 25 in the world or top three in the U.S."

During the negotiations for the settlement agreement, Foster informed USA Swimming, without Knutson's authority, that Knutson was out of money. Once, Foster e-mailed Young: "Can we get this resolved ASAP? At the last meet, Dagny was going to sleep at the airport because she is out of money." On another occasion, Foster forwarded to Wielgus an e-mail from Morgenstein that "Dagny has to pay $2500 for her classes or they [will] drop her. How can we get this contract and payments??? [¶] It[']s causing her und[ue] stress!" And again, Foster e-mailed Young: "FYI, I'm getting more and more pressure to file suit. Dagny is absolutely broke." Foster testified he received permission from either Knutson or Morgenstein to tell USA Swimming about Knutson's financial problems, but agreed that he never had Knutson's written authority to divulge attorney-client communications.

Foster sent the settlement agreement to Knutson and asked her to read it and let him know if she had any questions. He never met with her or had a telephone conference to discuss the agreement to ensure that she understood what she was committing to. Indeed, after Foster sent the final agreement to Knutson, she responded,

"Some of it was hard for me to understand because of the wording." Knutson also raised specific questions regarding upfront payments from USA Swimming. Foster's response to Knutson reads: "We wanted to get a little more up front, but this is a good deal. Sign the agreement, fax the signature page to me and mail the original."

## D.
### KNUTSON AND USA SWIMMING REACH A DEAL.

The agreement between Knutson and USA Swimming was signed on April 20, 2011. The terms of the deal were as follows: Tuition was provided from January through December 2012. Between 2013 and 2016, all payments were contingent upon Knutson being in the top 25 in the world or the top three in the United States in an Olympic event based on FINA's September rankings. The settlement agreement also released Schubert, although Knutson received no additional consideration for doing so. Foster never told Knutson she was releasing Schubert, or even that she had a right to sue Schubert individually. The agreement also contained a confidentiality clause, precluding Knutson from discussing her story outside her family and professional advisors. Foster never explained the confidentiality clause to Knutson.

## E.
### WERE THE PERFORMANCE MARKERS ACHIEVABLE, AND DID KNUTSON HAVE TO AGREE TO THEM?

At trial, Nancy Hogshead-Makar, an Olympic gold medalist, testified as an expert witness for Knutson. Hogshead-Makar testified that the performance markers included in the settlement agreement could not have been met by the most elite swimmers in the world. "It's onerous. It's burdensome. It's very rare that even the most elite athlete would be able to make that standard." She further testified that the markers were neither realistic nor comparable to a college scholarship. Based upon her experience and

11

knowledge of other top-level swimmers, she testified that only one percent of all swimmers would be able to meet the standard required by the performance markers. Hogshead-Makar had never had any performance markers while swimming.

By contrast, based on her knowledge of NCAA rules, Hogshead-Makar testified a college scholarship accommodates the "ups and downs that happen[] with students, particularly student athletes." Universities usually have counselors on staff paid for by the school, "a medical team that is there for the athletes," and a "safety net" for students to assure that their academic and swimming careers would stay on track despite life's interruptions. Hogshead-Makar spoke with the Auburn University swimming coach, who informed her that the services available there included emotional counseling, medical care, academic accommodations for eating disorders or other issues, and a team and peer support group "that is really unparalleled."

Foster never explained to Knutson that, even if she refused to enter the settlement agreement, she was already entitled to $2,500 per month if she maintained a top 16 world ranking under the Athlete Partnership Agreements, a funding program through USA Swimming. (Although the Athlete Partnership Agreements are discussed in the appellate record, we have no specific details about them.) In addition, grants were available to swimmers ranked in the top 32 in the world for tuition assistance.


F.

*KNUTSON TAKES TIME OFF FROM SWIMMING AND EVENTUALLY RETIRES FROM THE SPORT.*

After signing the deal with USA Swimming, Knutson transferred from Fullerton to Florida to swim under another Olympic coach. But swimming was not the same for her. "Every day I went to practice, meaning, I guess in my mind when I got to Florida—it was kind of like a rain cloud always following me. It was always on my mind that, I mean, that was something that I had to do. [¶] It didn't . . . give me freedom to just

12

chase the original dreams I wanted. It was like I was swimming on egg shells or walking on egg shells. I'm swimming not to lose."

In early 2012, Knutson stopped swimming to enter treatment programs for an eating disorder. (Knutson suffered from the eating disorder before signing the settlement agreement; she did not tell Foster or USA Swimming about it.) USA Swimming stopped paying Knutson in June 2012.

Knutson finished treatment in August 2012 and moved back to North Dakota, where she resumed training with her former coaches. She swam in several meets around the country.

In late 2013, she attempted to regain NCAA eligibility. To do so, the NCAA required that she provide them with a copy of her agency agreement with Morgenstein. After Knutson e-mailed Morgenstein three times without any real response, Foster became involved. Morgenstein asked Foster to request a release from Knutson. Foster told Knutson that Morgenstein could not find the agreement and had asked for a "statement not holding him liable for [Knutson] turning pro" in exchange for confirmation of the agency agreement. Knutson trusted Foster, and thought she had to provide the release in order to get the information needed to regain NCAA eligibility. Knutson received no consideration for the release of Morgenstein. After he received the release, Morgenstein found the agency agreement and provided a copy to Knutson.

In October 2013, Knutson asked Morgenstein for "records of dates of my payments to you from my mutual contract." Morgenstein forwarded Knutson's request to Foster who wrote to Morgenstein: "I don't see any problem. She has already waived any claims against you which would be extremely weak in any event."

Knutson did not regain her NCAA eligibility, and in February 2015, she decided she would no longer swim competitively.

13

## G.

*KNUTSON LEARNS ABOUT FOSTER'S CONFLICTS OF INTEREST.*

In 2014, Knutson learned of Foster's conflicts while representing her. She felt "very betrayed" and believed he had manipulated and taken advantage of her because she was naïve.

In April 2014, Knutson, through her new counsel, requested that Foster produce his entire file, including but not limited to e-mails. When compared to documents later produced in response to formal discovery requests, it became apparent that Foster had not initially produced many documents, including his November 16, 2010 e-mail to Wielgus stating that he would not "get involved with litigation against USA Swimming."

## H.

*PROCEDURAL HISTORY*

In September 2014, Knutson sued Foster for fraudulent concealment and breach of fiduciary duty. During trial, the court granted nonsuit as to plaintiff's noneconomic damages flowing from breach of fiduciary duty.

The jury found in favor of Knutson on both causes of action, and awarded economic damages of $217,810, past noneconomic damages of $250,000, and future noneconomic damages of $150,000. The jury awarded no punitive damages, despite its finding that Knutson proved by clear and convincing evidence that Foster engaged in wrongful conduct towards Knutson with malice, oppression or fraud. Judgment was entered in favor of Knutson.

Foster filed a motion for a new trial.[3] The trial court granted the motion on the grounds that Knutson failed to adduce evidence of causation and that the jury's award

---

[3] Foster also filed a motion for judgment notwithstanding the verdict. In light of its ruling on the motion for a new trial, the court denied the JNOV motion as moot. On

14

of damages was excessive. However, the court denied Foster's motion on two other grounds, namely that the trial court erred by refusing to instruct the jury on agency, and that Knutson's counsel's closing argument was improper and constituted an irregularity in the proceedings. Both Knutson and Foster filed notices of appeal.

## DISCUSSION

### I.

### *THE TRIAL COURT ERRED BY GRANTING FOSTER'S MOTION FOR A NEW TRIAL ON THE GROUND OF INSUFFICIENCY OF THE EVIDENCE OF CAUSATION.*

### A.

### *Legal Principles and Standard of Review*

"The authority of a trial court in this state to grant a new trial is established and circumscribed by statute. [Citation.] [Code of Civil Procedure] section 657 sets out seven grounds for such a motion: (1) 'Irregularity in the proceedings'; (2) 'Misconduct of the jury'; (3) 'Accident or surprise'; (4) 'Newly discovered evidence'; (5) 'Excessive or inadequate damages'; (6) 'Insufficiency of the evidence'; and (7) 'Error in law.'" (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633 (*Oakland Raiders*).) "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657.)

"On appeal from an order granting a new trial the order shall be affirmed if it should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons." (Code Civ. Proc., § 657.) "There are two exceptions: Orders may not be affirmed on the ground of insufficiency of the

appeal, Foster does not address the ruling on the JNOV motion.

15

evidence or on the ground of excessive or inadequate damages unless that ground is specified in the order." (*Oakland Raiders, supra,* 41 Cal.4th at p. 634; see Code Civ. Proc., § 657 [an order granting a motion for a new trial "shall not be affirmed upon the ground of the insufficiency of the evidence . . . unless such ground is stated in the order granting the motion"].) Code of Civil Procedure section 657 further provides "it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons."

Knutson's lawsuit alleged Foster committed fraud and breached his fiduciary duty while representing Knutson in her negotiations with USA Swimming. In his motion for a new trial, Foster contended that Knutson was required to prove she would have obtained a better result in the absence of Foster's fraud and breaches of fiduciary duty. The trial court granted Foster's motion for a new trial on the ground, inter alia, that "substantial factor causation [was] still an element of proof and . . . Plaintiff need[ed] to prove that if the misrepresentations had not been made, or that full disclosure of these relationships had been made and Plaintiff had employed another attorney . . . that she would have received a better result."

B.

*The Trial Court Erred by Finding Insufficiency of the Evidence Regarding the Causation Element for Both the Fraudulent Concealment and Intentional Breach of Fiduciary Duty Claims.*

Knutson contends the trial court erroneously granted the motion for a new trial. She claims that the "'better result'" method is an element unique to claims for attorney malpractice, but is inapplicable to fraudulent concealment and intentional breach of fiduciary duty claims asserted against an attorney. Foster argues the trial court did not apply a "'better result'" method but rather the substantial factor test for causation that is

16

applicable to Knutson's claims: "The Superior Court did not hold that a party must demonstrate that a 'better result' must be shown as a matter of law. Rather [it] held that, *under the facts of this case*, the jury could not have properly found that Foster's purported fraud was a substantial factor in causing [Knutson]'s claimed damages without such a showing." For reasons we will explain, we conclude the trial court erred by applying an incorrect legal standard for causation in granting a new trial.

1.

*Legal Standards of Causation Concerning Attorney Malpractice*

We begin our analysis by reviewing the standard of causation applicable to legal malpractice claims, as legal malpractice is often conflated with claims of fraud and breach of fiduciary duty asserted against attorneys.

In California, an attorney is subject to liability for malpractice "when his or her negligent investigation, advice, or conduct of the client's affairs results in loss of a meritorious claim." (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1092.) In a case of legal malpractice based on negligence, a plaintiff must show that "but for the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1244, italics omitted.) In *Viner v. Sweet*, the California Supreme Court cautioned that "[t]he requirement that the plaintiff prove causation should not be confused with the method or means of doing so. Phrases such as 'trial within a trial,' 'case within a case,' . . . and 'better deal' scenario describe methods of proving causation, not the causation requirement itself or the test for determining whether causation has been established." (*Id*. at p. 1240, fn. 4.)

The purpose of the causation requirement is to safeguard against speculative and conjectural claims and to ensure that damages awarded for the attorney's malpractice actually have been caused by the malpractice. (*Viner v. Sweet, supra,* 30 Cal.4th at p. 1241.) Because legal malpractice involves negligent conduct on the part of an attorney (see *Neel v. Magana, Olney, Levy, Cathcart & Gelfland* (1971) 6 Cal.3d 176,

17

180), causation for legal malpractice is analyzed differently than causation for the intentional torts of fraudulent concealment and intentional breach of fiduciary duty, of which Foster was accused.

## 2.

*Sufficient Evidence Was Presented at Trial to Establish Substantial Factor Causation on the Claim for Fraudulent Concealment.*

Fraud is an intentional tort distinct from malpractice. Fraud includes "[t]he suppression of a fact, by one who is bound to disclose it." (Civ. Code, § 1710, subd. (3).) "'[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.' [Citation.]" (*Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 748.)

Causation for fraud is properly determined using the substantial factor test. (*Strebel v. Brenlar Investments, Inc.* (2006) 135 Cal.App.4th 740, 752.) "It is the element of fraudulent intent, or intent to deceive, that distinguishes it from actionable negligent misrepresentation and from nonactionable innocent misrepresentation." (*Ibid.*) "Causation requires proof that the defendant's conduct was a "'substantial factor'" in bringing about the harm to the plaintiff." (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132.)

Here, the trial court recognized the different standards of causation between legal malpractice claims and fraud claims, but nevertheless erroneously applied the malpractice standard of causation to the fraudulent concealment claim. Although the

18

court referred to the substantial factor for causation, it used and applied the but for test. The order granting the motion for a new trial reads, in relevant part: "As to [Knutson]'s fraud theory, substantial factor causation is still an element of proof and it only seems reasonable to this Court that [Knutson] needs to prove that if the misrepresentations had not been made, or that full disclosure of these relationships had been made and [Knutson] had employed another attorney to deal with USA Swimming, that she would have received a better result."

When the correct standard of causation is applied, it is clear that sufficient evidence supports the jury's verdict on the fraud claim, and the trial court erred by granting the motion for a new trial on this ground. Foster concealed from Knutson:

— he had a relationship with USA Swimming and its personnel;

— his relationship with USA Swimming created a conflict of interest vis-à-vis his representation of Knutson;

— he would not litigate against USA Swimming, and he had shared that information with USA Swimming during his negotiations on behalf of Knutson;

— he had refused to represent Schubert in litigation against USA Swimming because he believed that would create a conflict of interest;

— he had told USA Swimming's executive director that he did not want the dispute between Knutson and USA Swimming "to escalate";

— making her story public or taking it to the press would be a bargaining chip for Knutson;

— Knutson might have an independent claim against Schubert;

— he did not believe she could prevail in litigation against USA Swimming due to the statute of frauds;

— USA Swimming had provided him with confidential information he had not shared with Knutson at USA Swimming's request;

19

— he had told USA Swimming during the negotiations that Knutson was out of money;

— the settlement agreement contained a release of Schubert and a confidentiality provision;

— his representation that Knutson could reach the performance markers in the settlement agreement was not based on any independent research;

— he had forwarded attorney-client privileged communications to USA Swimming during the negotiations for the settlement agreement;

— he had withheld e-mails containing evidence of his conflicts of interest when Knutson requested her file from his office; and

— Knutson might have been eligible for financial support through the Athlete Partnership Agreements or other sources without entering the settlement agreement.

A substantial factor in Knutson's decision to enter into the settlement agreement was Foster's fraudulent concealment of the foregoing facts. The settlement agreement contained unattainable performance markers that led to the loss of financial support from USA Swimming and to feelings of despair, loss, and unhappiness. She suffered both economic and noneconomic damages as a consequence. Knutson's economic damages were her lost tuition and support benefits. Knutson's noneconomic damages were the emotional distress and pain and suffering she experienced due to the performance markers in the deal with USA Swimming.

The jury found Foster liable for fraud and awarded Knutson economic damages of $217,810 and noneconomic damages of $400,000. There was enough evidence to find that Foster's fraud was a substantial factor in causing Knutson's damages.

20

3.

*Sufficient Evidence Was Presented at Trial to Establish Substantial Factor Causation on the Claim for Breach of Fiduciary Duty.*

"The breach of fiduciary duty can be based upon either negligence or fraud depending on the circumstances.  [Citations.]  It has been referred to as a species of tort distinct from causes of action for professional negligence [citation] and from fraud [citation]."  (*Ash v. North American Title Co.* (2014) 223 Cal.App.4th 1258, 1276.)  "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages."  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

The trial court applied the legal malpractice standard of causation to Knutson's intentional breach of fiduciary duty cause of action.  The court cited The Rutter Group's treatise on professional responsibility to equate causation for legal malpractice with causation for all breaches of fiduciary duty:  "'The rules concerning causation, damages, and defenses that apply to lawyer negligence actions . . . also govern actions for breach of fiduciary duty.'"  (See Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2017) ¶ 6:425.5, pp. 6-171 to 6-172, citing Rest.3d Law Governing Lawyers, § 49, com. e, pp. 349-352.)  This statement of the law is correct, however, only as to claims of breach of fiduciary duty arising from negligent conduct.

Substantial factor causation is the correct causation standard for an intentional breach of fiduciary duty.  (*Stanley v. Richmond, supra*, 35 Cal.App.4th at p. 1095.)  As the court stated in that case:  "It is plaintiff's burden to establish '"a reasonable basis for the conclusion that it was more likely than not the conduct of the defendant was a substantial factor in the result."'"  (*Ibid.*)  The authors of the Restatement Third of the Law Governing Lawyers recognized that causation for intentional breach of fiduciary duty might be treated differently from negligent breach:

21

"Under generally applicable fiduciary law, a claim of *intentional breach* might render applicable different defenses and causation and damages rules than would otherwise control." (Rest.3d Law Governing Lawyers, § 49, com. e, pp. 350, italics added.)

Here, Knutson's claim for breach of fiduciary duty is based on intentional conduct and, thus, is subject to the substantial factor standard of causation. Knutson's counsel argued at trial that Foster breached the following four fiduciary duties: "Loyalty, conflicts, not keeping the client informed, and failing to protect confidential information." The jury needed only to find that one of the claims for the breach of fiduciary duty was a substantial factor in causing harm to Knutson, and it did so.

Applying the correct test of causation, we conclude there was sufficient evidence to support Knutson's breach of fiduciary duty cause of action. The evidence established Foster breached his duty of loyalty by engaging in the following intentional acts:

— failing to provide written disclosures to Knutson of his relationships with USA Swimming;

—failing to ensure Knutson understood the terms of the settlement with USA Swimming;

—failing to employ all negotiation strategies beneficial to Knutson (such as threatening to go public with the dispute);

— failing to disclose all communications he received from USA Swimming personnel;

— failing to obtain any consideration for Knutson while encouraging her to sign a release of claims against Morgenstein; and

— telling Morgenstein that Knutson's claims against him would be weak.

The evidence established Foster breached his duty to avoid conflicts of interest by failing to advise Knutson in writing of his relationships with USA Swimming and Schubert. He breached his duty to keep Knutson informed by failing to share with

22

her "confidential" information provided by USA Swimming. He breached his duty to protect confidential information by forwarding to USA Swimming privileged attorney-client communications, and by disclosing Knutson's financial condition without her knowledge or consent. And Foster breached his duty to provide Knutson a complete copy of her client file when requested. These breaches of Foster's fiduciary duty caused Knutson harm initially by failing to provide her with all the information she needed to make an informed decision about entering into the settlement agreement with USA Swimming and failing to ensure that Knutson's best interests were being protected by Foster during the negotiations. Knutson was also harmed when she later learned of the Foster's breaches and suffered emotional distress.

## II.

*THE TRIAL COURT ERRED BY GRANTING FOSTER'S MOTION FOR A NEW TRIAL ON THE GROUND OF EXCESSIVE DAMAGES.*

### A.

*The Trial Court Erred by Concluding Testimony by a Lay Witness Was Insufficient, in This Case, to Establish Emotional Distress Damages.*

The trial court also granted the motion for a new trial on the ground that the award of noneconomic damages was excessive because there was no evidence supporting them: "Turning to the jury's award of non-economic damages, [Foster] argues that the award of $400,000 was unsupported by the evidence and the Court agrees. [Foster]'s argument and some description of evidence in the opposition are that *no expert testimony connected emotional distress and [Foster]'s conduct*, that [Knutson] stipulated she was not seeking damages for the eating disorder . . . , she stipulated that she lost NCAA eligibility before [Foster]'s involvement so emotional distress could not be attributed to that, and finally there was minimal evidence of emotional distress at trial—consisting of [Knutson]'s testimony about feeling betrayed, violated, and manipulated by [Foster] which included her apparently tearing up during her testimony." (Italics added.) We

23

consider whether expert testimony is required to support Knutson's claim for noneconomic damages.

The law in this state is that the testimony of a single person, *including the plaintiff*, may be sufficient to support an award of emotional distress damages. "If credited by the jury, appellant's testimony about the extreme pressure she was under and her state of mind during the last few weeks of Richmond's representation—including feelings of abandonment and betrayal by her attorney, anxiety over her possible loss of her family home, and undue pressure to obtain financing on a timetable established for the benefit of her attorney and opposing counsel—as well as her loss of lifetime health benefits, may well be sufficient to support an award of damages for emotional distress from the alleged breaches of fiduciary duty." (*Stanley v. Richmond, supra,* 35 Cal.App.4th at p. 1097; see *McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1162-1163 [emotional distress damages in insurance bad faith action may be established by the plaintiffs' testimony; it was improper for the jury to award emotional distress damages to those plaintiffs that neither testified nor produced other evidence of their damages]; *Tan Jay Internat., Ltd. v. Canadian Indemnity Co.* (1988) 198 Cal.App.3d 695, 708.)

Numerous cases approve the award of emotional distress damages based on the testimony of nonexpert witnesses. In *Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 465, the appellate court affirmed the jury's award of emotional distress damages because there was sufficient evidence to support it. The opinion does not indicate any expert testimony was offered to establish the plaintiff's emotional distress. Rather, the opinion quotes the plaintiff's own testimony that the loss of her disability benefits led to her need to borrow money and the sale of her home, which caused her "to feel that she was 'just nothing any more, useless.' She was deeply depressed. She testified: 'I just—I didn't feel like—I didn't want to sell my house; I didn't want to leave and—I had three children down there [in San Bernardino], grandchildren; nice neighbors.

24

[¶] The house I had was very efficient; it was—was something I had always dreamed of, maybe, a little Spanish house.  All my furniture was Spanish.  [¶] It was something I fell in love with the minute I walked in the door.  And to leave it to—to—not even knowing where I was going to go, not knowing what I was going to do—I was just very, very depressed, felt sick.'" (*Id.* at p. 460.)  The plaintiff further testified that when she learned she would only realize $1,765 from the sale of her house, she felt "anguish.  'So I just—I figured I wouldn't get anything back at all.  I was just completely—I saw red.  [¶] I just decided I didn't want anything to do with anybody—the insurance company—I didn't care, I just wanted to forget everything, go to sleep, forget the whole works.  I was thoroughly disgusted and depressed and really down.'" (*Ibid.*)

In *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 821, the appellate court affirmed a judgment of which $450,000 was attributable to emotional distress damages due to racial discrimination.  The testimony regarding the plaintiff's emotional distress was as follows:  "With respect to evidence concerning [the plaintiff]'s emotional distress, [the plaintiff] testified that he has nightmares about his supervisors 'going after [him] at night,' that he is under stress, that he has been treated by a doctor with medication for high blood pressure, that his relationship with his children has changed, that his wife threatened to leave him because of his 'stressed-out' condition caused by his work situation, that he has trouble sleeping and that he eats less.  He worries about mortgage payments and his future ability to afford private schooling for his children.  Although he was referred for psychological counseling, there was no testimony that he received treatment from a psychologist or psychiatrist.  *No medical practitioner testified concerning his emotional distress*.  [The plaintiff]'s wife testified that he used to be a fun-loving person but has changed.  She testified that [the plaintiff] now cries a lot and has withdrawn from activities with his children and with social acquaintances.  She confirmed that she had threatened to leave her husband because he was unhappy and would not communicate.  She testified that they were having difficulty paying bills and

25

that they could not afford to send their children to private school." (*Id.* at p. 812, italics added.)

Testimony of an expert witness is required when the subject matter "is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) The emotional distress to which Knutson testified is not beyond the common experience of the jurors. Knutson testified that the performance markers in the agreement led to stress and extra pressure that made swimming an emotionally painful activity.

"Q. How do you describe—after the agreement was entered into with USA Swimming in April of 2011, can you describe in your own words any stress of extra pressure you felt in having to meet that standard? [¶] . . . [¶]

"A. Every day I went to practice, meaning, I guess in my mind when I got to Florida—it was kind of like a rain cloud always following me. It was always on my mind that, I mean, that was something that I had to do.

"It didn't—to me, it didn't give me freedom to just chase the original dreams I wanted. It was like I was swimming on egg shells or walking on egg shells. I'm swimming not to lose."

Knutson also testified that when she learned about Foster's duplicitousness, she felt betrayed and developed a lack of trust in others that continued through the time of trial.

"Q. When you found out about things that Mr. Foster had done when he represented you, as you indicated you found these things out recently, how did it make you feel?

"A When I found all this information out, I felt very betrayed.

"Q. Can you elaborate as to what you mean by 'betrayed'?

"A. Ever since I was eight years old, before I started swimming, all I wanted to do was go to the Olympics.

26

"I put my whole life into the sport of swimming. And it wasn't fair to me what I found out. It wasn't fair to my family who sacrificed just as much to make sure I could go to a swim meet, and I just—I don't know how I'm supposed to trust someone like that again.

"I just assume people are not good, like I used to—I felt manipulated and taken advantage of because I was naïve. I didn't know. I didn't know.

"I remember last summer, I drove from Phoenix to North Dakota to spend the summer at home. And the second half of the trip, I was supposed to stay with a family from South Dakota just to break up the drive, and I just sobbed on the way home; my swimming career and not—not being able to swim with the same friends and not being able to accomplish things that I really wanted to.

"I felt violated that someone did that, and shared that stuff with other people, and I didn't know about it. I just wanted to go home to my dad.

"So I got home about 3:00 in the morning, because I just couldn't get myself to have to stay with someone else."

Because expert testimony was not necessary to support Knutson's testimony, the trial court erred by granting the motion for a new trial on the issue of Knutson's emotional distress damages. We note that there may be certain cases where testimony of an expert witness would be necessary to support all or part of an emotional distress damages claim. For example, expert testimony would be required to the extent a plaintiff's damages are alleged to have arisen from a psychiatric or psychological disorder caused or made worse by a defendant's actions and the subject matter is beyond common experience. We are not addressing such a case here. In this case, the emotional distress damages arose from feelings of anxiety, pressure, betrayal, shock, and fear of others to which Knutson herself could and did testify. Expert testimony was not required.

27

## B.

*Because There Was Sufficient Evidence of the Causal Connection Between Foster's Actions and Knutson's Damages, the Trial Court Erred by Granting a New Trial on the Ground Those Damages Were Excessive.*

The trial court also granted the motion for a new trial on the ground of excessive damages because there was no causal connection between Foster's wrongful conduct and the damages awarded. "The Court finds that because there was a failure to provide sufficient evidence to provide the necessary causal connection between [Foster]'s wrongful conduct and the full amount of the economic damages provided in the testimony of witness Graves, the award of the economic damages by this jury was excessive and based on insufficient evidence[,] entitling [Foster] to a New Trial." For the same reasons we reverse the order granting the motion for a new trial as to causation, we also reverse the order as to the damages on this ground.

## C.

*Because the Trial Court's Order Did Not Specify that Damages Were Excessive Due to Not Being Limited to the Time Period After the Fraud Was Discovered, We Need Not Address the Issue on Appeal.*

Knutson argues that the trial court erred by limiting her damages to those suffered after she discovered the fraud committed by Foster. Knutson contends she is entitled to damages incurred from the time the fraud was committed. This was not, however, a ground for granting the new trial specified in the statement of reasons in the trial court's order granting the motion for a new trial. The trial court's oral statements made at the hearing on the motion are not part of the final order.[4]

---

[4] At the hearing, the trial court stated: "The damages occur when she discovers the fraud." The trial court also stated: "I'm saying that the damages in this case were non-economic damages of embarrassment, the feeling of the betrayal, the disappointment that she felt when she was informed by her new lawyer of these facts that she was previously unaware of."

28

## III.

*WE NEED NOT ADDRESS THE TRIAL COURT'S NONSUIT ORDER REGARDING EMOTIONAL DISTRESS DAMAGES DUE TO OUR RESOLUTION OF THE APPEAL FROM THE ORDER GRANTING THE MOTION FOR A NEW TRIAL.*

During trial, the court granted nonsuit as to Knutson's recovery of emotional distress damages from Foster's breach of fiduciary duty. On appeal, Knutson asks this court to review this order only if we were to affirm the new trial court's order granting the motion for a new trial. Because we reverse that order, we need not address this argument further.

## IV.

*THE TRIAL COURT DID NOT ERR BY DENYING FOSTER'S MOTION FOR NONSUIT ON THE ISSUE OF CAUSATION.*

Following the presentation of Knutson's case, Foster moved for nonsuit on the ground Knutson had failed to prove her damages had been caused by Foster. (Code Civ. Proc., § 581c.) The issues presented by this argument have been fully addressed *ante*, in connection with Knutson's argument that the trial court erred in granting the motion for a new trial on causation.

## V.

*THE TRIAL COURT DID NOT ERR BY DENYING FOSTER'S MOTION FOR A NEW TRIAL WITH REGARD TO JURY INSTRUCTIONS AND THE SPECIAL VERDICT ON THE ISSUE OF AGENCY.*

Foster contends that Morgenstein was Knutson's agent, both for purposes of the statute of limitations (whether Morgenstein's knowledge that Foster had a relationship with Schubert and USA Swimming might be imputed to Knutson) and of consent to violation of confidentiality (whether Morgenstein was acting as Knutson's agent when he asked Foster to provide information regarding Knutson's financial condition to USA Swimming during their negotiations).

29

Foster proposed several special jury instructions defining actual and ostensible agency and explaining imputation of knowledge from an agent to the principal. The trial court denied Foster's request for these instructions. Foster also proposed a special verdict form that included the following question with respect to the statute of limitations for breach of fiduciary duty: "Before September 15, 2013, did Plaintiff Dagny Knutson *or her agent* know of facts, or would a reasonable investigation have disclosed facts, that would have caused a reasonable person to suspect that she had suffered harm that was caused by someone's wrongful conduct?" (Italics added.) Similarly, with respect to the statute of limitations on the cause of action for fraud, the proposed special verdict form stated: "Before September 15, 2011, did Plaintiff Dagny Knutson *or her agent* know of facts, or would a reasonable investigation have disclosed facts, that would have caused a reasonable person to suspect that she had suffered harm that was caused by someone's wrongful conduct?" (Italics added.) The trial court did not include in the special verdict forms Foster's proposed language regarding agency.

A party is entitled to have the jury instructed on its theory of the case provided that party requests and submits legally correct instructions, and there is sufficient evidence to support the theory. (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 547.)

It is well-established under California law that "[b]oth principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." (Civ. Code, § 2332.) An agent's knowledge acquired before or during the agency is imputed to the principal if it concerns the subject of the agency and is within its scope. (*Capron v. State of California* (1966) 247 Cal.App.2d 212, 232.)

Morgenstein admitted he did not have an athlete representation agreement executed by Knutson. Morgenstein's athlete representation agreement, which apparently was signed by Knutson's mother, provided that Morgenstein would "develop, negotiate,

30

organize and administer all income producing opportunities and activities that may be available to [Knutson] as a result of [Knutson's] reputation as a celebrity and athlete." Knutson's consultation with Foster was not an "income producing opportunity." There is no evidence that Morgenstein was Knutson's agent for any other aspect of her life. To the contrary, the athlete representation agreement expressly recited that it did not confer a general "Right of Attorney." The trial court did not err.

## VI.

*THE TRIAL COURT DID NOT ERR BY DENYING FOSTER'S MOTION FOR NONSUIT ON THE STATUTE OF LIMITATIONS DEFENSE.*

Knutson executed the settlement agreement with USA Swimming in April 2011. This action was filed more than three years later, on September 15, 2014. Foster contends that Knutson's case was barred by the applicable statutes of limitations, and that the trial court should therefore have granted Foster's motion for nonsuit on this ground.

In reviewing an order denying a motion for nonsuit, we view the evidence in the light most favorable to the plaintiff. Denial of a nonsuit motion will be reversed only when "no substantial evidence exists tending to prove each element of the plaintiff's case." (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 263.)

The limitations period for a breach of fiduciary duty cause of action is "one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first." (Code Civ. Proc., § 340.6, subd. (a) [action against attorney for wrongful act or omission]; *Stoll v. Superior Court* (1992) 9 Cal.App.4th 1362, 1363-1364 [Code Civ. Proc., § 340.6 applies to breach of fiduciary duty claim based on attorney malpractice].) The limitations period for Knutson's fraud claim is three years; the limitations period does not begin to run until the

31

aggrieved party discovers the facts constituting the fraud. (Code Civ. Proc., § 338, subd. (d).)

To invoke delayed accrual, a plaintiff must prove facts showing (1) lack of knowledge; (2) that in the exercise of reasonable diligence, the facts could not have been discovered at an earlier date; and (3) how and when the plaintiff actually discovered the fraud or mistake. (3 Witkin, Cal. Procedure (5th ed. 2016) Actions, § 659, and cases cited therein.) When a plaintiff has notice or information of circumstances sufficient to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his or her investigation, the statute begins to run.

Foster's motion for nonsuit on statute of limitations grounds was based entirely on Morgenstein's knowledge in 2010 that Foster had previously represented Schubert. Foster argued that because Morgenstein was Knutson's agent, his knowledge must be imputed to Knutson. "The basis for imputing knowledge to the principal is that the agent has a legal duty to disclose information obtained in the course of the agency and material to the subject matter of the agency, and the agent will be presumed to have fulfilled this duty. [Citations.] The scope of the imputation of knowledge is directly related to the scope of the duty arising from the agency agreement; it has nothing to do with whether the agent actually has the information in question or has it only constructively." (*Triple A Management Co. v. Frisone* (1999) 69 Cal.App.4th 520, 534-535.) The evidence before the court included the athlete representation agreement, signed by Knutson's mother and Morgenstein, which provided that Morgenstein was Knutson's agent for purposes of endorsement deals and income-producing opportunities. Morgenstein did not have authority to represent Knutson in connection with legal matters, and therefore any knowledge Morgenstein had regarding Foster's previous representation of Schubert cannot be imputed to Knutson. In fact, the agreement signed by Knutson's mother and Morgenstein specifically limits any claim that Morgenstein had

32

a general power of attorney to act as Knutson's agent: "PMG does not possess Right of Attorney."


## VII.

### *THE TRIAL COURT DID NOT ERR BY DENYING FOSTER'S MOTION FOR A NEW TRIAL BASED ON IRREGULARITY OF THE PROCEEDINGS CAUSED BY THE ALLEGED MISCONDUCT OF COUNSEL DURING CLOSING ARGUMENT.*

Foster contends the trial court erred by denying his motion for a new trial based on Knutson's counsel's alleged misconduct. Attorney misconduct that rises to the level of an "irregularity in the proceedings" preventing a party from having a fair trial may be grounds for a new trial. (Code Civ. Proc., § 657, subd. 1; *Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1122.) Arguing facts not justified by the record, or suggesting that the jury engage in speculation, may be misconduct. (*Malkasian v. Irwin* (1964) 61 Cal.2d 738, 747.) However, a new trial is only proper "if it is reasonably probable that the party moving for a new trial would have obtained a more favorable result absent the misconduct." (*Bell v. Bayerische Motoren Werke Aktiengesellschaft, supra,* 181 Cal.App.4th at p. 1122.)

Foster cites two instances of alleged attorney misconduct during closing argument. First, Knutson's counsel argued "[t]here is nothing more vile and degrading than getting down on your knees and throwing up in a toilet, but she did this to make herself feel better." Foster contends this argument was highly prejudicial, and violated a stipulation that Knutson was not contending and would not attempt to admit any evidence that Foster's actions caused or exacerbated her eating disorder.[5]

---

[5] Before trial, Foster filed a motion in limine to exclude expert testimony from Sherri Bates, Psy.D., who was retained to testify as to the nature and extent of Knutson's eating disorder, and the extent to which Foster's actions caused or exacerbated that disorder. Knutson's trial counsel decided not to pursue that claim for relief, and therefore advised the court he would not call Dr. Bates as a witness, *unless* Foster offered evidence that Knutson had withdrawn the claim or that Knutson had retained an expert to testify

33

In denying the new trial motion on this ground, the trial court correctly found that Foster waived the issue by failing to timely object to the argument. (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148 [claim of misconduct of counsel waived unless objection is made].)

Second, Knutson's counsel argued, with regard to the testimony of one of Knutson's experts, Alison Buchanan, that due to the communications between Foster and USA Swimming regarding Knutson's financial issues, "You may as well have announced a fire sale. Wink, wink. Nod, nod, my client's ripe for settlement. She's broke. [¶] That is a breach of the duty of loyalty, which is another breach of a fiduciary duty." Foster contends this argument was improper because Buchanan was precluded from testifying that Foster's representation of Knutson fell below the standard of care in representing her. Following an Evidence Code section 402 hearing on Buchanan's qualifications, the trial court ruled that she could not opine as to Foster's exercise of competence in the negotiations of the deal "other than talking about general terms." The court also ruled that she could testify about "disclosure of potential conflicts, confidentiality, and perhaps in a limited fashion as to the acts that are in the utmost good faith in plaintiff's interest."

Foster neither objected to the argument, nor to the underlying testimony to which Knutson's counsel was referring. Foster therefore waived this issue. (*Garcia v. ConMed Corp., supra,* 204 Cal.App.4th at p. 148.)

In any event, Foster fails to show how he was prejudiced by either instance of alleged attorney misconduct. Even egregious acts of misconduct do not require reversal if prejudice has not been shown. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1250-1251; *Garcia v. ConMed Corp., supra*, 204 Cal.App.4th at p. 149.) The comments complained of were isolated and not repeated, and no prejudice has been shown. (*People*

_____

about it. Foster withdrew the motion in limine.

34

*v. Pensinger* (1991) 52 Cal.3d 1210, 1250.)  We conclude that the trial court did not err in denying the motion for a new trial based on attorney misconduct.


DISPOSITION

The postjudgment order granting Foster's motion for a new trial is reversed. The matter is remanded with directions to reinstate the judgment.  Appellant Dagny Knutson to recover costs on appeal.

Pursuant to Business and Professions Code section 6086.8, subdivision (a) and California Code of Judicial Ethics canon 3D(2), the clerk of this court is directed to forward a copy of this opinion to the California State Bar and directly to Richard J. Foster upon issuance of the remittitur.



FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.

35