Filed 09/12/19

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CARRA CROUCH, | |
| Plaintiff and Respondent, | G055602 |
| v. | (Super. Ct. No. 30-2012-00577733) |
| TRINITY CHRISTIAN CENTER OF SANTA ANA, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment and postjudgment orders of the Superior Court of Orange County, Peter J. Wilson, Judge.  Affirmed.

Dykema Gossett, James S. Azadian, Jill M. Wheaton; Winters & King, Michael J. King, Ted J. Nelson; Enterprise Counsel Group and Garrett M. Fahy for Defendant and Appellant.

Deems Law Offices, Joseph E. Deems; Dunlap, Bennett & Ludwig and David R. Keesling for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

Carra Crouch, at age 13, was drugged and raped by a 30-year-old employee of Trinity Christian Center of Santa Ana, Inc. (TCC) while she was in Atlanta, Georgia to participate in a TCC-sponsored telethon.[1]  When Carra returned to California, she and her mother, Tawny Crouch, went to see Carra's grandmother, Jan Crouch, who was a TCC officer and director and was responsible for overseeing the telethon.  When Tawny explained to Jan Crouch what had happened to Carra in Atlanta, Jan Crouch flew into a tirade and yelled at Carra that she was stupid, it was really her fault, and she was the one who allowed it to happen.  Carra was devastated.

Based on Jan Crouch's conduct, the jury awarded Carra $2 million in damages (later remitted to $900,000) against TCC on her cause of action for intentional infliction of emotional distress (IIED).  The jury found that Jan Crouch was acting within her authority as an officer or director of TCC when she yelled at Carra.  TCC appealed. It challenges the judgment and the trial court's orders overruling its demurrer to Carra's first amended complaint and denying its motions for summary adjudication, nonsuit, a judgment notwithstanding the verdict (JNOV), and a new trial.

At each stage of the trial court proceedings, and again on appeal, TCC has argued that Jan Crouch's conduct was not extreme or outrageous but was just a grandmotherly scolding or irascible behavior.  According to TCC, Carra endured nothing more than insults, petty indignities, and annoyances.

We conclude that Jan Crouch's behavior toward Carra was sufficiently extreme and outrageous to impose liability for IIED.  Yelling at 13-year-old girl who had been drugged and raped that she was stupid and she was at fault exceeds all possible

---

[1]  The parties throughout these proceedings and in their appellate briefs have often referred to Carra as a victim of sexual assault or molestation.  The evidence establishes she was a victim of rape.

bounds of decency. By telling Carra she was at fault, Jan Crouch displayed a reckless disregard for the almost certain emotional distress Carra would, and did, suffer.

We also conclude the evidence was sufficient to support the jury's finding Jan Crouch was acting within the course and scope of her authority as an officer or director and, therefore, to support respondeat superior liability against TCC. We reject TCC's other arguments and affirm.

## FACTS

The following facts either are undisputed or taken from the evidence at trial. We refer to Carra Crouch and Tawny Crouch by first name, except when their full names appear in quoted matter, and sometimes refer to Jan Crouch by first name.

## I.

### The Incident in Atlanta

TCC is a California nonprofit corporation. In April 2006, Carra, who was then 13 years old, flew with her grandmother, Jan Crouch, to Atlanta, Georgia to attend a telethon sponsored by TCC. While in Georgia, Carra planned to visit her cousins Nick and Nathan. She had also received a message from Steve Smith, a 30-year-old TCC employee, that he hoped to see her in Atlanta. Nick and Nathan had introduced Smith to Carra, and she had kept in contact with him.

One evening, Smith made an advance toward Carra at the hotel swimming pool. Carra had never experienced an adult behaving that way toward her and did not understand his intentions.

Carra returned to the hotel room she shared with her cousin Nathan and changed her clothing. Smith went to the hotel room, and Carra and Nathan let him in. Smith asked if he could "crash" in their room that night. Carra felt a little uncomfortable about letting him stay, but figured he would sleep on the floor.

Smith brought alcoholic beverages and cigarettes with him and also ordered champagne from room service. Smith, Carra, and Nathan drank and smoked cigarettes.

3

Carra had never smoked and, except for sips of wine given by her grandfather, had never drunk alcoholic beverages before. She drank a glass or two of champagne. While they were drinking, Smith rubbed Carra's leg and told her she was beautiful. Carra felt uncomfortable but did not understand what he was doing or what his intentions were.

Eventually, Carra lay down on her bed, Smith lay down on the floor, and the lights were turned off. Smith claimed he was uncomfortable on the floor and asked if he could sleep in the bed next to Carra. She felt uncomfortable, but agreed so long as a pillow was placed between them. Smith moved the pillow and tried to hold Carra up against his body. Carra felt uncomfortable. She got out bed and said, "I don't feel good."

Smith got up and went into the bathroom. After a few minutes, he returned with what he said was a glass of water. He handed the glass to Carra and told her, "drink this. It will help you feel better."

Carra drank the water. It tasted "a little bit funny." She remembered nothing after that other than waking up the next morning with Smith next to her in bed. Her clothes were disheveled, her pants were off, and she felt sick, shocked, and confused. She went to the bathroom and used a tissue to wipe blood from her vagina. She had not yet started menstruating. She felt sore in her vaginal area.

## II.

### Jan Crouch's Tirade Against Carra on April 24, 2006

Upon returning to California, Carra told her mother, Tawny Crouch, about what had happened in Atlanta. Tawny urged Carra to talk to Jan Crouch, Carra's grandmother and the family matriarch. Jan Crouch was a TCC officer and director, was the "go-to for everybody" and was "running the show."

Tawny called Jan Crouch and asked if she and Carra could come see her because something had happened in Atlanta. Jan said sure. Tawny contacted Jan

4

because "she was on the trip with [Carra]," and "she was the spiritual advisor and the person who had the power to do something."

On April 24, 2006, Tawny took Carra to Jan Crouch's home in Newport Beach. Carra was not ready to talk about being raped and asked Tawny to tell Jan what had happened. Tawny told Jan that in Atlanta a TCC employee named Steven Smith had molested Carra. As Tawny started going into the details, Jan raised herself up in her seat and flew into a tirade. Jan yelled at Carra: "How could you be so stupid? How could you drink alcohol? How could you let this man in your room?" Jan eventually said to Carra, "well, this is really your fault" and "you're the one who let this happen."

Tawny called a timeout and told Carra to go into another room to wait. Carra went back to the car while Tawny talked privately with Jan Crouch. Jan raged against Tawny, who tried to point out that Carra was just 13 years old. Jan eventually threw up her hands and said, "I can't handle this" and told Tawny to "call Dottie," referring to Jan's sister, Dottie Casoria, who was the TCC station manager in Atlanta.

In the car, Carra broke down. She already was fragile and now felt "broken" after listening to Jan's tirade. Carra already blamed herself and Jan had confirmed those feelings. Tawny returned to the car and told Carra: "This isn't your fault. Please know this isn't your fault. You know, he was a 30-year-old man and you're a child." But Carra was not responsive and, when they got home, she went to her bedroom and broke down.

### III.

### TCC's Investigation

Tawny followed Jan's instructions and called Dottie "right away." Tawny told Dottie that Carra had been molested in Atlanta by a TCC employee. Dottie was "very loving and understood." Tawny also advised John Casoria, TCC's general counsel and Jan's nephew, about what had happened. At Casoria's request, Carra and Tawny prepared a written statement. Tawny told Casoria she did not want the police notified.

Neither of Carra's parents notified authorities or took Carra to receive medical treatment or a rape examination.

Casoria contacted Jan Crouch, and she granted him "'the authority to take whatever action [he] felt was necessary or needed to protect the best interest of Trinity Christian Center of Santa Ana, Inc.'" Casoria terminated Smith's employment with TCC and notified the Georgia Department of Labor that Smith's conduct could lead to civil liability and criminal charges. Casoria never talked to Jan about his investigative findings but did ask her for authority to terminate Smith's employment. After Smith's employment was terminated, Casoria sent Jan a written report informing her that "events involving Steve Smith went smoothly."

## IV.

## Carra's Subsequent Troubled Life

Carra had a troubled life as a teenager and young adult. She testified she started cutting herself when she was in the eighth grade, "huffed" carbon dioxide at school, and saw a therapist to deal with emotional problems. She testified she "went from one negative situation to the next, one self-destructive behavior to the next." In around 2012, when this lawsuit was filed, she started feeling better; she no longer believed being raped was her fault and stopped living in shame and guilt.

Calvin A. Colarusso, M.D., is a psychiatrist who testified at trial as an expert on Carra's behalf. He testified that Carra "began to drink and use drugs," "cut herself," "made a suicide attempt," "had sex with approximately ten different boys," "had pregnancies at [ages 16, 17, and 19]," "had two abortions and one miscarriage," obtained an alternative high school degree because she could not continue in a traditional school, was involved in "abusive sex, some of which involved alcohol or drugs," "worked as an exotic dancer," "became pregnant again at [age 22]," and "had problems eating."

Colarusso diagnosed Carra with child sexual abuse and post-traumatic stress disorder. He testified: "Carra's chaotic adolescence is definitely due to the sexual

6

abuse and the family's reaction to the sexual abuse, by not telling her it wasn't her fault, by not taking her for a rape exam, by not following up and getting her treatment." He testified there were three causes of Carra's difficulties as a teenager and young adult: (1) "she was sexually abused by a 30-year-old man"; (2) "her grandmother blamed it on her"; and (3) "no one . . . reported it and took her to get a rape examination, supported her that it was not her fault, and got her the treatment that she needed."

Jan Crouch passed away after the lawsuit was filed but before trial.

## PROCEDURAL HISTORY

### I.

### Pretrial

#### A. *TCC's Demurrer*

In June 2012, Carra filed a complaint against TCC and two months later filed a first amended complaint against TCC, Jan Crouch, and Casoria. The first amended complaint asserted causes of action for (1) IIED, (2) negligence—failure to report, (3) negligence—failure of due care, and (4) vicarious liability.

TCC demurred to the first amended complaint. TCC asserted the first cause of action failed to state facts sufficient to constitute a cause of action against TCC because Carra failed to allege it engaged in any conduct that was extreme, outrageous, and exceeded all bounds of common decency in a civilized society. The trial court overruled TCC's demurrer to the first and second causes of action, sustained with leave to amend TCC's demurrer to the third cause of action, and sustained without leave to amend the demurrer to the fourth cause of action. Carra filed a second amended complaint, which TCC answered.

#### B. *TCC's Summary Adjudication Motion*

Following discovery, TCC moved for summary adjudication of the IIED cause of action. TCC argued the alleged conduct was not extreme or outrageous as a

matter of law, Jan Crouch never intended to cause emotional distress, and Carra could not prove that Jan's conduct caused her to suffer severe emotional distress. The trial court denied TCC's motion. The court found: "In this case, there are triable issues of material fact on what defendant Jan Crouch said to Carra Crouch, its emotional impact on Carra Crouch, defendant Jan Crouch's recommendation to let John Casoria handle this matter, and Tawny Crouch's reliance on this recommendation and letting defendant John Casoria handle this matter, which would include whether a report to law enforcement would be made or not. . . . Tawny Crouch testified that [Jan Crouch]'s response to Carra Crouch was like a tirade. In addition, here, as generally, causation is a question of fact."

### C. *TCC's Motion to Exclude Expert Testimony*

Before trial, TCC moved to exclude Colarusso's testimony and requested an Evidence Code section 402 hearing on causation. Carra had retained Colarusso to testify and render an opinion on causation, her emotional and psychological injuries and their physical manifestations, her treatment, damages, prognosis, and future care and costs. TCC argued Colarusso should not be permitted to testify whether lack of family support was a cause of harm to Carra because he could not apportion liability to Jan Crouch, as opposed to other family members, without engaging in speculation. Carra argued Colarusso would testify about "the course of [Carra]'s development after the sexual assault would have been different and she would not have had all of the psychological and emotional problems that she had in her life had she been handled appropriately following the reporting of the sexual assault."

After conducting an Evidence Code section 402 hearing, the court orally stated that Colarusso "cannot be asked to opine that any action or inaction after the events comprising the IIED and the negligent failure to report, caused or contributed to those conditions or damages" and would not be allowed to opine on what Jan Crouch, TCC, or any family member did or said after April 24, 2006. In a written order, the court ruled

8

that Colarusso would be permitted to testify to (1) "his observation as to the symptoms consistent with [there] having been a sexual assault or potential rape" and (2) "the behavior of Jan Crouch was a substantial factor in regards to the [IIED] and negligence claims." The court ruled that Colarusso "is not to offer his opinion that the 7 years of silence caused or contributed to actions after the alleged incident in Georgia."

## II.

## Trial

### A. *TCC's Nonsuit Motion*

The case proceeded to trial against TCC on the causes of action for IIED and negligent failure to report. (Jan Crouch and Casoria were dismissed before trial.) TCC contended that Colarusso's testimony violated the trial court's order by referring on several occasions to events and conditions in the seven-year period of time following Carra's meeting with Jan Crouch in April 2006. TCC moved for a mistrial or to strike Colarusso's testimony. The trial court denied the motion. The court found Colarusso's testimony had not violated the court's order in that "[h]is testimony good, bad, or indifferent . . . all stems from the meeting and the failure to report."

After Carra rested her case, TCC moved for a nonsuit on the IIED cause of action. TCC argued Jan Crouch had not engaged in any extreme or outrageous conduct in her meeting with Carra in April 2006. TCC asserted: "This case will stand alone in all of California jurisprudence if this jury is allowed to find that a grandmother, *who was solicited in her home after hours to give advice and comfort*, can be sued because the Plaintiff did not like what advice grandmother gave." Jan's comments to Carra, including the comment that Carra was at fault for being raped, were, according to TCC, "typical to normal grandmother-to-granddaughter" relations. TCC argued that Carra failed to present evidence that Jan Crouch intended to cause her severe emotional distress, that Jan Crouch was acting in the course and scope of her TCC duties during the

9

conversation, or that Carra suffered severe emotional distress caused by Jan's conduct on April 24, 2006, as opposed to the events occurring after that date or the rape itself.

The trial court denied TCC's motion for a nonsuit with the proviso the jury would have to be instructed that TCC could be liable only if Jan Crouch were acting in the course and scope of her position as an ordained minister for, or president or board member of, TCC.

## B. *The Jury Verdict*

The jury returned a verdict in favor of Carra and awarded her $2 million in damages on the IIED cause of action. In the special verdict form, the jury made these findings:

1. At the time of the April 24, 2006 incident at Jan Crouch's home, Jan Crouch was acting within the course and scope of her authority as an officer or director of TCC.

2. On April 24, 2006, Jan Crouch, while acting within the course and scope of her authority as an officer or director of TCC, engaged in conduct that was outrageous in front of Carra and was directed at her.

3. On April 24, 2006, Jan Crouch, while acting within the course and scope of her authority as an officer or director of TCC, intended to cause Carra emotional distress or acted with reckless disregard of the probability that Carra would suffer emotional distress, knowing that Carra was present when the conduct occurred.

4. The conduct of Jan Crouch, while acting within the course and scope of her authority as an officer or director of TCC, was a substantial factor in causing Carra to suffer severe emotional distress.

5. On April 24, 2006, Jan Crouch was not acting in her professional capacity as a clergy member of TCC.

10

The jury awarded Carra $1 million for past noneconomic loss for mental suffering and $1 million for future noneconomic loss for mental suffering. The jury allocated responsibility for damages as follows: Jan Crouch—45 percent; Steve Smith—20 percent; Paul Crouch, Jr. (Carra's father)—0 percent; Tawny Crouch—35 percent. Judgment awarding Carra $2 million in damages against TCC was entered.

## III.

### Posttrial

A. *TCC's JNOV Motion, Motion for a New Trial, and*
*Motion to Vacate Judgment*

TCC moved for a JNOV on the grounds (1) substantial evidence did not support the jury's finding that Jan Crouch was acting within the course and scope of her authority as an officer or director of TCC when she spoke with Carra on April 24, 2006, (2) Jan's conduct toward Carra on April 24, 2006 was not extreme or outrageous as a matter of law; (3) substantial evidence did not support the jury's finding that Jan's conduct caused Carra to suffer severe emotional distress.

TCC moved for a new trial on the same grounds as the JNOV motion and on these additional grounds: (1) the jury's award included compensation for harm caused by the rape and lack of family support following the April 2006 meeting; (2) damages were excessive; (3) Colarusso's testimony exceeded the scope permitted by pretrial orders; and (4) the court erred by not instructing the jury with CACI No. 433 (superseding criminal/tortious acts). TCC moved to vacate the judgment under Code of Civil Procedure section 663 on the ground the judgment was inconsistent with the verdict in that the jury found Jan Crouch to be responsible for 45 percent of Carra's damages but awarded the full $2 million against TCC.

11

B. *The Trial Court's Rulings*

The trial court found there was substantial evidence to support the jury's findings and for that reason denied TCC's JNOV motion. The court denied TCC's motion to vacate the judgment.

The court did find, however, the jury's award and apportionment of 45 percent of the fault to Jan Crouch could not be reconciled. The jury's apportionment of fault would make sense only if it were directed to the negligent failure to report cause of action, but the jury found against Carra on that cause of action. Thus, the judgment could not be corrected to be consistent with the verdict.

The court granted TCC's new trial motion on the issue of damages only, unless Carra accepted a remittitur of damages to $900,000. The court found the verdict "amounted to a finding that [Carra]'s total damages, and not only those arising out of the incident involving Jan Crouch on April 24, 2006, amounted to $2,000,000.00, and those damages are accordingly excessive as applied to the first cause of action [IIED] only." The court made an independent determination that "$900,000 would be fair and reasonable for the first cause of action." The court rejected TCC's arguments regarding the scope of Colarusso's testimony and instructional error.

Carra accepted the remittitur. At the trial court's direction, a Judgment on Jury Verdict (Amended) (the Amended Judgment) was entered in favor of Carra and against TCC for $900,000 (plus interest and costs). TCC filed a notice of appeal from the judgment, the Amended Judgment, and the trial court's orders denying the motion for a JNOV and the motion to vacate the judgment and conditionally granting the motion for a new trial.[2]

---

[2] Because Carra accepted the remittitur of damages, the trial court's order effectively denied TCC's motion for a new trial. An order denying a motion for a new trial is not directly appealable but is reviewable from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.)

## DISCUSSION

## I.

### Jan Crouch's Conduct Toward Carra Was
### Extreme and Outrageous

Before directly addressing TCC's challenges to the trial court's pretrial, trial, and posttrial orders and rulings, we resolve the central issue presented by this appeal:  Whether Jan Crouch's conduct towards Carra on April 24, 2006 constituted extreme and outrageous conduct sufficient to state a cause of action and recover for IIED.

A cause of action for IIED requires proof of:  (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe emotional distress; and (3) the defendant's extreme and outrageous conduct was the actual and proximate cause of the severe emotional distress.  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.)

A defendant's conduct is considered to be outrageous if "it is so ""extreme as to exceed all bounds of that usually tolerated in a civilized community.""" (*Hughes v. Pair, supra*, 46 Cal.4th at p. 1051; see *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001; see also Rest.2d Torts, § 46, com. d, p. 73.)  Liability for IIED does not extend to """mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.""" (*Hughes v. Pair, supra*, 46 Cal.4th at p. 1051.)  Malicious or evil purpose is not essential to liability for IIED.  (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1045.)

California's definition of extreme and outrageous conduct is based on comment d to section 46 of the Restatement Second of Torts.  (See *Hughes v. Pair, supra*, 46 Cal.4th at p. 1051.)  Comment d to section 46 states:  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

13

intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" (Rest.2d Torts, § 46, com. d, p. 73.)

We do not hesitate to exclaim "Outrageous!" when presented with the facts of Jan Crouch's behavior toward Carra. Flying into a tirade at a 13-year-old girl who had been drugged and raped and yelling at her that she was stupid and it was her fault is extreme and outrageous conduct that exceeds that bounds of decency tolerated in a civilized community. Such conduct is not mere insults, indignities, petty oppressions or other trivialities. At age 13, Carra suffered a horrible, traumatic, and life-altering experience. Yelling at her that she was stupid and it was her fault was cruel, intolerable, and obviously certain to produce severe emotional harm.

The examples of outrageous conduct given in comment d to section 46 of the Restatement Second of Torts reinforce a sense of outrage. Example 1 is: "As a practical joke, A falsely tells B that her husband has been badly injured in an accident, and is in the hospital with both legs broken. B suffers severe emotional distress. A is subject to liability to B for her emotional distress. If it causes nervous shock and resulting illness, A is subject to liability to B for her illness." (Rest. 2d Torts, § 46, com. d, illus. 1, p. 73.) Example 3 is: "A is invited to a swimming party at an exclusive resort. B gives her a bathing suit which he knows will dissolve in water. It does dissolve while she is swimming, leaving her naked in the presence of men and women whom she has just met. A suffers extreme embarrassment, shame, and humiliation. B is subject to liability to A for her emotional distress." (*Id.*, § 46, com. d, illus. 3, p. 74.)

Jan Crouch's conduct toward Carra was no less outrageous than falsely telling someone that his or her spouse was badly injured in an accident and more outrageous than the dissolving bathing suit.

Jan's conduct is made all the more outrageous by her knowledge of Carra's plight. Comment f to section 46 of the Restatement Second of Torts states: "The

14

extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge." (Rest.2d Torts, § 46, com. f, p. 75.) Jan knew what happened to Carra in Atlanta. That is what Tawny was telling her. Jan knew that Carra was only 13 years old. Jan knew or should have known that Carra would be peculiarly susceptible to emotional distress.

The cases relied on by TCC do not help it. In *Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 492 the defendant told his girlfriend he intended to purchase airline tickets for her and her daughter with a carrier that had recently suffered a crash. The Court of Appeal, affirming the dismissal of the IIED claim, held the defendant's implied death threat was not sufficiently outrageous because "the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." (*Id*. at pp. 495-496.) The court concluded the defendant's implied death threat was part of an "exchange of hostile unpleasantries" that did not rise to the level of IIED. (*Id*. at p. 498.) In *Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1119, 1129, the Court of Appeal held that the defendant's comments to the plaintiff that she was "senile" and a "liar" were "objectively offensive and in breach of common standards of civility" but "not so egregiously outside the realm of civilized conduct as to give rise to actionable [IIED]."

Yelling at a 13-year-old rape victim that she is stupid and it was her fault is markedly worse and far more extreme than offering to buy a plane ticket on an airline that had recently suffered a crash or commenting that someone is senile and a liar.

TCC presents Jan's conduct as merely a grandmotherly scolding or a display of "irascible temper" and asserts the entire incident was simply an emotional family squabble that should not be the subject of litigation. TCC resorts to hyperbole, saying "[i]t is no overstatement that the floodgates of litigation would bust open,

15

dominating the dockets of our already burdened civil courts to adjudicate such family disputes over purely verbal insults." That is very much an overstatement. But more to the point, we are not addressing an IIED claim based on a family squabble: Jan might have been Carra's grandmother, but the jury found that when Jan flew into her tirade on April 24, 2006, she was acting in her capacity as an officer or director of TCC. Later in this opinion, we conclude substantial evidence supported that finding. Because Jan Crouch was acting in her capacity as an officer or director on April 24, 2006, her behavior on that day was not merely part of a family squabble.

Besides, TCC's characterization of Jan's tirade as a squabble is patently wrong. A squabble is a quarrel and Tawny and Carra were not quarreling with Jan about anything. Tawny and Carra went to see Jan to tell her about what had happened to Carra in Atlanta. Jan blew up at Carra in response.

TCC argues repeatedly that Carra cannot recover for IIED because she did not prove a special relationship. Carra did not need to plead or prove a special relationship because she proved extreme and outrageous conduct. "It is only where there is a special relation between the parties, as stated in § 48, that there may be recovery for insults not amounting to extreme outrage." (Rest.2d Torts, § 46, com. d, p. 73.) A requirement of a special relationship does not appear in the California Supreme Court's formulation of the elements of IIED. (See, e.g. *Hughes v. Pair, supra*, 46 Cal.4th at pp. 1050-1051; *Potter v. Firestone Tire & Rubber Co., supra,* 6 Cal.4th at p. 1001; *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) To recover for *negligent* infliction of emotional distress, a plaintiff must prove a special relationship with the defendant (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 205) but Carra sought recovery for intentional infliction, for which proof of a special relationship is not required.

TCC also argues repeatedly that Jan's conduct was verbal and "Carra faced a higher burden than a claim based on words *and* conduct." Neither case cited by TCC

16

supports that proposition. (See *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1610; *Yurick v. Superior Court, supra*, 209 Cal.App.3d at p. 1123.) Both of those cases simply restate the proposition that insults, indignities, annoyances, and the like are not actionable as IIED. Moreover, Jan's words were joined with conduct: Jan flew into a tirade (conduct) and yelled (more conduct) at Carra. Even if Jan Crouch just used words, as life experiences teach, words can be devastating and the source of severe emotional injury. Her conduct toward Carra was not a mere annoyance or insult, and Carra suffered far more than hurt feelings and petty indignities. We emphasize that Jan's statements to Carra, a 13-year-old girl, that being raped was her fault and she let it happen, were not mere insults or petty indignities, were not trivial, and certainly were not a mere grandmotherly scolding.

## II.

### The Trial Court Did Not Err by Overruling TCC's Demurrer.

TCC argues the trial court erred by overruling its demurrer to first cause of action of the first amended complaint because Carra failed to plead: (1) extreme and outrageous conduct; (2) vicarious liability for Jan Crouch's conduct; and (3) intent to cause, or reckless disregard of the probability of causing, emotional distress. We conclude the court did not err by overruling the demurrer.

We independently review the ruling on a demurrer and determine de novo whether the pleading alleges facts sufficient to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) Construing the allegations in a reasonable manner, we assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and matters of which judicial notice can and have been taken. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

17

As to the first point, Carra alleged: "Plaintiff had a meeting with Jan in Jan's TBN affiliate owned mansion[3] located in Newport Beach, CA where she told her everything that had happened. In response, Jan became furious and began screaming at [Carra], a thirteen-year-old girl, and began telling her 'it is your fault.'" Carra also alleged that Jan knew Carra was "peculiarly susceptible to injuries through mental distress" because she was 13 years old and had just been raped. These allegations track the facts proven at trial. We have concluded those facts demonstrate conduct that is sufficiently extreme and outrageous to state a cause of action for IIED. Carra did not need to plead a special relationship because she alleged extreme and outrageous conduct.

As to the second point, Carra alleged that Jan Crouch was a TCC director and was acting within the course and scope of her employment with TCC at all relevant times. Carra alleged she was raped by a 30-year-old employee of TCC while she was at a TCC event and went to speak with Jan at her home about what had happened. Those allegations and facts reasonably inferred from them are sufficient to impose vicarious liability against TCC for Jan's conduct. Under the respondeat superior doctrine, an employer is liable for the torts of its employees committed within the scope of employment. (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296 (*Lisa M.*).)

As to the third point, Carra alleged: "[Jan Crouch] not only undertook these actions with, at the very minimum, reckless disregard of the fact that they would certainly cause [Carra] to suffer severe emotional distress; [Jan Crouch] undertook these actions with the intent and purpose to cause that harm to [Carra] so she would not report the incident to the police or news media." Carra alleged that Jan abandoned Carra's

---

3 Carra alleged in her complaints and asserts on appeal that TCC owned Jan Crouch's home in Newport Beach. The only evidence of this is Tawny's testimony that she took Carra to see Jan at "[h]er TBN home." Whether TCC owned the home or not is not a factor in our decision.

18

interests "in favor of the conflicting interests of [TCC]." Those allegations, construed with allegations of Jan Crouch's conduct and knowledge that Carra was peculiarly susceptible to suffering emotional distress, were sufficient to plead the element of IIED that Jan Crouch acted with the intention of causing, or reckless disregard of the probability of causing, severe emotional distress.

## III.

### The Trial Court Did Not Err by Denying TCC's Motion for Summary Adjudication.

TCC argues the trial court erred by denying its motion for summary adjudication because Carra failed to establish a triable issue of material fact that (1) Jan Crouch's conduct was extreme and outrageous and (2) Jan Crouch intended to cause, or recklessly disregarded the probability for causing, severe emotional distress. "'We review orders granting [or denying] summary judgment or summary adjudication de novo. [Citations.] A motion for summary judgment or summary adjudication is properly granted if the moving papers establish there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law.'" (*Taswell v. Regents of University of California* (2018) 23 Cal.App.5th 343, 350.)

In support of its summary adjudication motion, TCC submitted portions of Carra's deposition transcript. Carra's deposition testimony established that while in Atlanta she was raped by a 30-year-old TCC employee. Carra testified in her deposition that she and Tawny met with Jan Crouch on April 24, 2006 and Tawny told Jan what had happened to Carra in Atlanta. Jan became "agitated" and said, "It's your fault" and "Why would you have a man in your room? Why did you think that was okay?" Carra testified that Jan made her feel like it was her fault and that "I was the one asking for it."

In opposition to the motion for summary adjudication, Carra submitted portions of Tawny's deposition transcript. Tawny testified that when she and Carra met

19

with Jan Crouch on April 24, 2006, Jan "went into a tirade of . . . blaming Carra," looked at Carra, and said, "How could you let him do this? You should have known better."

The deposition transcripts created a triable issue of material fact on both whether Jan's conduct was extreme and outrageous and whether Jan Crouch intended to cause, or recklessly disregarded the probability for causing, severe emotional distress.

## IV.

### The Trial Court Did Not Err by Denying
### TCC's Motion for Nonsuit

TCC argues the trial court erred by denying its motion for nonsuit because Carra did not present substantial evidence that: (1) Jan Crouch engaged in extreme and outrageous behavior during the meeting on April 24, 2006; (2) Carra suffered severe emotional distress as a result of Jan Crouch's conduct on April 24, 2006; and (3) Jan Crouch was acting in the course and scope of her authority as a TCC officer and director during the meeting on April 24, 2006.

#### A. *Standard of Review*

A trial court may grant a motion for nonsuit if the plaintiff's evidence would not support a jury verdict in the plaintiff's favor. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214.) We review an order denying a motion for nonsuit de novo by using the same standard as the trial court, and will affirm the order so long as substantial evidence supports the jury's verdict. (*Mendoza v City of West Covina* (2012) 206 Cal.App.4th 702, 713; *M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1532.) In determining whether the plaintiff's evidence is sufficient, we do not weigh the evidence or assess witness credibility. (*Castaneda v. Olsher, supra*, 41 Cal.4th at p. 1214.) We accept as true the evidence most favorable to the plaintiff, disregard conflicting evidence, and draw every legitimate inference from the evidence in the plaintiff's favor. (*Ibid.*)

B. *There Was Substantial Evidence of Extreme and*
*Outrageous Conduct.*

The trial court did not err by denying TCC's motion for a nonsuit. Carra and Tawny testified consistently about what Jan said and how she behaved on April 24, 2006. Carra testified that Jan yelled: "How could you be so stupid? How could you drink alcohol? How could you let this man in your room? How could you, how could you, how could you, blah, blah, blah. And she eventually said, 'well, this is really your fault.'" Tawny testified she told Jan about what had happened to Carra in Atlanta. Tawny testified that as she went into the details: "Jan raised up in her seat and just started yelling in a tirade. . . . [¶] [Jan] started yelling: How could you let a stranger in your room—a strange man in your room? Why would you drink alcohol with a strange man? You know, didn't your mom teach you any better? Tawny, aren't you a better mother than that? Why didn't you teach her? [¶] . . . Carra, it's your fault. You know, you're the one [who] let this happen."

We have concluded that Jan Crouch's behavior, as related by the testimony of Carra and Tawny, was sufficiently extreme and outrageous to support recovery for IIED. The evidence was sufficient to support a jury verdict in Carra's favor.

C. *There Was Substantial Evidence Carra Suffered Severe*
*Emotional Distress.*

TCC argues Carra did not present substantial evidence of severe emotional distress. This argument is based on Carra's testimony that "I went [to Jan] feeling ashamed and embarrassed. *And all [Jan] did was confirm* that for me which made me feel like I couldn't talk about it anymore." According to TCC, that testimony suggests Carra's emotional distress was caused by Jan's failing to tell her it was not her fault. This argument seriously misconstrues the cited testimony, particularly when considered in light of Carra's other testimony. Carra testified she "was already fragile" and, after being excused from the meeting on April 24, 2016, "felt broken." Carra testified: "I had already felt like it was my fault, which is why it was so hard to tell the story. And after

21

she confirmed that for me, I never wanted to discuss it again. I just couldn't. . . . I was fragile before, and I was broken after." Carra testified that when Tawny later asked to recount what had happened in Atlanta, it was hard to relive and, "after what happened with [Jan Crouch] . . . I was absolutely humiliated."

By telling Carra that being raped was her fault, Jan confirmed Carra's sense of shame and belief she was at fault. Carra's testimony not only demonstrates that Carra suffered severe emotional distress, but underscores just how bad Jan's conduct was. Jan knew, of course, that Carra was only 13 years old, and had just been told what had happened to Carra in Atlanta. A sentient human being, and certainly an ordained member of the clergy, would understand that a girl in Carra's position would hold feelings of shame and guilt and those feelings could be confirmed and made worse by telling her it was her fault. Indeed, Carra testified that it was not until this lawsuit was filed that she "didn't believe that it was my fault anymore" and "I wasn't living in shame and guilt anymore."

Carra's testimony alone was enough to avoid nonsuit. "The law in this state is that the testimony of a single person, *including the plaintiff*, may be sufficient to support an award of emotional distress damages." (*Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1096.)

But there was more. Colarusso testified that "Carra's chaotic adolescence" and difficulties as a young adult were due not only to being sexually assaulted at age 13, but to Jan Crouch blaming Carra and failing to tell her that being raped was not her fault. TCC argues Colarusso did not apportion any particular harm to Jan's conduct. He did not have to. His testimony was sufficient to establish that Jan's conduct on April 24, 2006 was a substantial factor in causing Carra severe emotional distress, manifested throughout her teenage and young adult life in various kinds of self-destructive behavior. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968-969 ["a cause in fact is something that is a substantial factor in bringing about the injury"].) The evidence was

22

sufficient to support a jury verdict in Carra's favor on the issue of severe emotional distress damages.

D. *There Was Substantial Evidence to Impose Respondeat Superior Liability Against TCC.*

The evidence presented by Carra was sufficient to support the jury's finding that Jan Crouch acted within the course and scope of her duties as an officer or director of TCC when she threw her tirade. Under the respondeat superior doctrine, an employer is liable for the torts of its employees committed within the scope of their employment. (*Lisa M., supra*, 12 Cal.4th at p. 296.) An employee's willful, malicious, and even criminal torts may fall within the scope of his or her employment, even though the employer did not authorize the employee to commit crimes or intentional torts. (*Id.* at pp. 296-297.)

"Despite the broad range of acts that may give rise to the imposition of vicarious liability, before such liability will be imposed on the employer there must be a connection between the employee's intentional tort and the employee's work." (*Perry v. County of Fresno* (2013) 215 Cal.App.4th 94, 101.) The employee need not have intended to further the employer's interest for the employer to be liable if there is a "causal nexus" between the intentional tort and the employee's work. (*Lisa M., supra*, 12 Cal.4th at pp. 297-298.) The connection or causal nexus required for respondeat superior liability is the tort must have been engendered by or arise from the work. (*Id.* at p. 298.) The required connection has been described as (1) "the incident leading to injury must be an 'outgrowth' of the employment"; (2) the risk of tortious injury is "'inherent in the working environment'"; (3) the risk of tortious injury is "'typical of or broadly incidental to the enterprise [the employer] has undertaken'" or (4) "the tort was, in a general way, foreseeable from the employee's duties." (*Id.* at pp. 298-299.)

"These various terms have been condensed into a two-prong disjunctive test. [Citation.] The conduct of an employee falls within the scope of his or her

23

employment if the conduct either (1) is required by or incidental to the employee's duties, or (2) it is reasonably foreseeable in light of the employer's business." (*Montague v. AMN Healthcare, Inc.* (2014) 223 Cal.App.4th 1515, 1521.)

Before resting, Carra presented evidence that Jan Crouch was an officer and director of TCC and was a cofounder of Trinity Broadcasting Network. Portions of Jan's deposition testimony were read into evidence during Carra's case. When asked what her duties for TCC were in 2006, Jan Crouch testified "[t]he list would be endless." She testified she "just was involved in everything and that never stopped to this day" and "I honestly am involved in almost everything. As co-founder." Jan testified that she was responsible for overseeing the telethon in Atlanta in 2006 and "I pretty well make all the decisions at the telethon when I'm leading one."

Paul Crouch, Jr. testified he was a member of the TCC board of directors and chief of staff and knew what Jan's responsibilities and daily activities were in 2006. He testified Jan "was the go-to for everybody" and "[s]he was running the show."

Tawny testified she contacted Jan because "she was on the trip with [Carra]," and "she was the spiritual advisor who *had the power to do something*." (Italics added.) In her deposition, Tawny testified she took Carra to see Jan because "she was the person who was ultimately in charge of the telethon, employees, and everybody else, and her grandmother." (This portion of Tawny's deposition transcript was read during cross-examination of Tawny for impeachment purposes).

At the meeting on April 24, 2006, Jan Crouch exclaimed "I can't handle this" and directed Tawny to "call Dottie." A fair inference, and one which we must draw, is that by making those statements, Jan was acknowledging she had the authority to deal with the situation but was delegating to Dottie, who was the TCC station manager in Atlanta, where the telethon had been held.

Casoria, TCC's counsel, contacted Jan Crouch about the scope of his authority in investigating the matter. Jan gave Casoria the authority to do whatever he

24

thought was necessary to protect the best interest of TCC. Casoria testified that in relation to the investigation of the rape, whenever Jan directed him to do something she was acting in her capacity as an officer of TCC. Casoria prepared a written report for Jan after Smith's employment had been terminated.

This evidence is sufficient to establish a causal nexus between Jan Crouch's work and the tort. Jan was a TCC officer and director with an "endless list of duties," was the go-to person at TCC, and was in charge of the Atlanta telethon. Carra was raped by a TCC employee while in Atlanta for the telethon. Tawny took Carra to Jan because Jan had been in charge in Atlanta and had the power to do something. When Tawny and Carra met with Jan and told her what had happened, she flew into a tirade, engaged in extreme and outrageous conduct, and referred Tawny and Carra to Dottie, another TCC employee. The trial court succinctly and accurately explained why the evidence was sufficient to impose respondeat superior liability against TCC: "[T]his was at a church function [and] after the church function [Carra] went to the boss of the church. Where is there not a relationship between the person and the event and the circumstances under with which this happened, and going to someone with the express power and authority to address this situation?"

The fact that Jan Crouch was the one who defined and granted Casoria's scope of authority in conducting the investigation supports a finding that when Tawny and Carra met with Jan to report the incident, Jan was acting within the scope her authority as a TCC officer or director. The fact that Jan gave Casoria authority to protect *TCC's* best interest, and not that of her granddaughter Carra, is further proof that Jan was acting in her capacity as an officer or director of TCC in handling the situation, both at the meeting with Carra and Tawny on April 24, 2006 and in directing the investigation.

It was entirely foreseeable that somebody injured in connection with a corporate event would report that injury to the corporate official who was in charge of that event and who was running the show. That is what happened here when Tawny took

25

Carra to see Jan Crouch. We conclude it was therefore also foreseeable that the corporate official could and would respond to the report in a tortious manner, making the corporate employer liable under a respondeat superior theory.

## V.

### The Trial Court Did Not Err by Denying TCC's Motion for a JNOV

TCC argues the trial court erred by denying its motion for a JNOV because there was not substantial evidence to support findings that (1) Jan Crouch engaged in extreme and outrageous behavior during the meeting on April 24, 2006; (2) Carra suffered severe emotional distress as a result of Jan conduct on April 24, 2006; and (3) Jan was acting in the course and scope of her authority as a TCC officer and director.

"A trial court may grant a motion for JNOV only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support it. [Citation.] The standard of review on appeal is the same as that in the trial court—whether any substantial evidence, contradicted or uncontradicted—supports the jury's conclusion." (*Gonzales v. City of Atwater* (2016) 6 Cal.App.5th 929, 946-947.) We have concluded with respect to the motion for nonsuit that Carra produced evidence sufficient to support a jury verdict in her favor that Jan Crouch engaged in extreme and outrageous behavior, Carra suffered severe emotional distress as a result, and Jan was acting in the course and scope of her authority as a TCC officer and/or director. Because the evidence was sufficient to support the jury's verdict, the trial court did not err by denying TCC's motion for a JNOV. (See *Crane v. Sears Roebuck & Co.* (1963) 218 Cal.App.2d 855, 858 [motion for JNOV "must rest upon the same consideration of the evidence as in a nonsuit"].)

# VI.

## The Trial Court Did Not Err by Denying TCC's
## Motion for a New Trial

TCC argues the trial court erred by denying its motion for a new trial because the evidence was insufficient to support the jury's findings and, therefore, the verdict was against the law. We have concluded in connection with TCC's motion for nonsuit and motion for a JNOV that substantial evidence supported the jury verdict. The same holds true for TCC's motion for a new trial.[4] TCC also argues the trial court erred by denying its motion for a new trial because (1) Colarusso violated a pretrial order and gave prejudicial opinion testimony on causation and (2) the trial court failed to instruct the jury on superseding criminal/tortious acts (CACI No. 433).

---

[4] In denying TCC's motion for a new trial, the trial court well summed up the evidence: "While [TCC] attempted to characterize the meeting as just a family meeting with raised voices, with all blame attaching to events before and after that meeting, the facts presented to the jury indicated otherwise. The conduct of Jan Crouch was described by Tawny Crouch as a complete yelling tirade against the then 13-year-old [Carra], blaming her for the fact that she had been molested by a 30-year-old man at a church-related function. [¶] The jury heard evidence, including from [TCC]'s general counsel, John Casoria, explaining this outburst in terms of Jan Crouch being concerned to ensure that there be no negative impact for the church, with apparent complete disregard for the welfare of [Carra]. [¶] The evidence established that [Carra] exhibited, over a period of many years, severe emotional dysfunction after April 2006. She herself testified with respect to the April 24, 2006 meeting, that, 'I was fragile before and I was broken after.' [¶] [Carra]'s expert witness, Dr. Colarusso, specifically identified three main reasons for the disastrous adolescence that this girl's had: One, the fact that there was a sexual attack; two, that her grandmother criticized and blamed her instead of consoling her; and, three, that it was not reported and so therefore the whole process of evaluation, examination, condolence, and treatment did not occur. [¶] . . . [¶] [Carra]'s disastrous adolescence was fully presented to the jury. There was evidence sufficient to establish that the April 24, 2006 meeting directly contributed to that disastrous adolescence and the court cannot but conclude that $900,000 is an appropriate sum for the past and future non-economic loss for mental suffering."

A. *Standard of Review*

"An order denying a motion for new trial will not be set aside unless there was an abuse of discretion that resulted in prejudicial error." (*Jenks v. DLA Piper Rudnick Gray Cary US LLP* (2015) 243 Cal.App.4th 1, 8.) We accord great deference to the trial court's exercise of its wide discretion in ruling on a motion for a new trial. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872.) In reviewing an order denying a motion for a new trial, we review the entire record, including the evidence, and independently determine whether any error was prejudicial. (*Id.* at p. 872.)

B. *Colarusso's Testimony Did Not Violate the Trial Court's Pretrial Order, and TCC Forfeited Its Challenge to Colarusso's Testimony*

After the Evidence Code section 402 hearing, the trial court issued an order that Colarusso would be permitted to testify only to (1) "his observation as to the symptoms consistent with [there] having been a sexual assault or potential rape" and (2) that "the behavior of Jan Crouch was a substantial factor in regards to the [IIED] and negligence claims." The court stated on the record that Colarusso "cannot be asked to opine that any action or inaction after the events comprising the IIED and the negligent failure to report, caused or contributed to [Carra's] condition[] or damages." TCC argues Colarusso's trial testimony violated this order, and TCC suffered prejudice as a result.

At page 59 of the appellant's opening brief, TCC identifies three passages from Colarusso's trial testimony that it contends violated the trial court's order. First, Colarusso testified: "Carra's chaotic adolescence is definitely due to the sexual abuse and the family's reaction to the sexual abuse, by not telling her it wasn't her fault, by not taking her for a rape exam, by not following up and getting her treatment." Second, Colarusso testified his opinion as to the causes of Carra's behavior after April 2006 was: "One, that she was sexually abused by a 30-year-old man; two, that her grandmother blamed it on her; and three, that no one . . . reported it and took her to get a rape

28

examination, supported her that it was not her fault, and got her the treatment that she needed." Third, Colarusso testified about a person's developmental history in general and Carra's developmental history until age 13.

Colarusso's testimony was consistent with the trial court's order. Colarusso testified that Carra's behavior was caused by Jan Crouch telling Carra it was her fault and by her family's failure to report the situation and take her for treatment. That testimony was expressly permitted by the trial court's order. The court stated on the record that Colarusso could testify to events in 2006, that is, "intentional infliction of emotional distress because of what Jan Crouch has alleged to have done right at that time, and the negligent failure to report at that time." Colarusso did not testify as to the nature of the sexual assault or that Carra had been raped (subjects prohibited by the court's order) or that the lack of family support in the years following the incident caused or contributed to Carra's injuries (also prohibited by the order). Consistently with the order, Colarusso testified that Jan Crouch's conduct on April 24, 2006 was a substantial factor in causing Carra's injuries.[5] Reasonably read, Colarusso's testimony about the reaction of Carra's family, and the family's failure to take her for a rape examination and get her treatment, concerned events in April 2016, and not the years following—the so-called "7 years of silence" referred to in the trial court's order.

---

[5] TCC contends that Carra's trial counsel "ma[d]e matters worse" by asking the jury in closing argument to award damages against TCC for Carra's past and future harm caused by the sexual assault. To the extent TCC intends this contention to be a distinct issue or point of error, it is forfeited. (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"].) We have nonetheless considered the cited passage of counsel's closing argument and do not interpret it as a request that the jury award improper damages. Moreover, TCC did not object to this argument or request an admonition. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 794-795; see also *People v. Seumanu* (2015) 61 Cal.4th 1293, 1341 ["'It is now well settled that an appellate court will not consider a claim as to the misconduct of counsel in argument unless objection is so made'"].)

Colarusso's challenged testimony, even if beyond the scope of the court's order, is not reversible error. Error in the admission of evidence warrants reversal only if the error "resulted in a miscarriage of justice" (Evid. Code, § 353, subd. (b)); that is, it is reasonably probable a result more favorable to the appealing party would have been reached in absence of the error (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 527). To the extent Colarusso testified about things people said or did after April 2006, his challenged testimony not only was harmless, but in large part helpful to TCC. Colarusso did not pin all of the blame for Carra's emotional distress on Jan's behavior; instead, he testified that Carra's troubles were also caused by Smith, as well as by Tawny and Paul Crouch, Jr., who did not report the rape or seek treatment for Carra. Indeed, the trial court observed that the relevance of testimony about events occurring after 2006 and the family's lack of support "is defense if not offensive." The jury found in TCC's favor on Carra's claim for negligent failure to report.

Further, we observe, TCC did not make contemporaneous objections to or motions to strike any of the challenged testimony. The failure to object or move to strike evidence at trial forfeits any challenge to the evidence on appeal. (Evid. Code, § 353, subd. (a); *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 726; see *People v. Townsel* (2016) 63 Cal.4th 25, 45-46 [failure to make contemporaneous objection to expert testimony forfeits claim of error]; *People v. Anderson* (2001) 25 Cal.4th 543, 586 ["a challenge to the admission of evidence is not preserved for appeal unless a specific and timely objection was made below"].) Issues pertaining to the permitted scope of Colarusso's testimony were complicated, and contemporaneous objections would have permitted the trial court to clarify the scope of its order, create a better record for appeal, correct errors in the first instance, and mitigate any potential prejudice. (See *People v. Mendez* (2019) 7 Cal.5th 680, 693.) In making its ruling, the trial court stated that in applying the order to Colarusso's testimony, the court "will listen to the questions and I will hear the objections."

Rather than pose contemporaneous objections, TCC waited and brought a motion for a mistrial; however, by that time, any error had been forfeited. TCC did move in limine to exclude Colarusso's testimony, but that too was ineffective to preserve TCC's claim that specific parts of Colarusso's testimony exceeded the scope permitted by the trial court's order. A motion in limine to exclude evidence is sufficient to preserve an objection if the motion (1) is directed to a particular, identifiable body of evidence; (2) states a specific legal ground for exclusion that is subsequently raised on appeal; and (3) is made at a time before or during trial when the trial court can determine the evidentiary issue in its appropriate context. (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) "When such a motion is made and denied, the issue is preserved for appeal." (*People v. Morris, supra*, at p. 190.)

But the ground raised by TCC on appeal for challenging Colarusso's testimony is not the same as any of the grounds stated in the motion in limine. TCC contends Colarusso's testimony exceeded the scope permitted by the trial court's order, a ground obviously not made in TCC's motion in limine. It was therefore incumbent upon TCC to make contemporaneous objections to or move to strike Colarusso's challenged testimony on the ground it violated the trial court's order. Failure to so object deprived Carra the opportunity to create a better record. (See *Duronslet v. Kamps, supra*, 203 Cal.App.4th at p. 726 ["Lack of such objection deprives the proponent of the evidence an opportunity to establish a better record or some alternative basis for admission"].)

C. *TCC Was Not Entitled to CACI No. 433*.

TCC argues the trial court erred by rejecting its request to instruct the jury with CACI No. 433. "The propriety of jury instructions is a question of law that we review de novo." (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.) "Upon request, a party is entitled to nonargumentative and correct instructions on every theory advanced by that party if the theory is supported by substantial

31

evidence." (*Chanda v. Federal Home Loans Corp.* (2013) 215 Cal.App.4th 746, 755.) In determining whether an instruction should have been given, we review the evidence in the light most favorable to the requested instruction. (*Ibid.*)

CACI Nos. 432 and 433 pertain to third party conduct or intentional/criminal conduct as a superseding intervening cause absolving the initial tortfeasor of any liability. CACI No. 432 pertains to later third party negligent conduct while CACI No. 433 pertains to later third party intentional or criminal conduct.

CACI No. 433 reads:

"[Name of defendant] claims that [he/she/it] is not responsible for [name of plaintiff]'s harm because of the later [criminal/intentional] conduct of [insert name of third party]. [Name of defendant] is not responsible for [name of plaintiff]'s harm if [name of defendant] proves [both/all] of the following:

"[1. That [name of third party] committed [an intentional/a criminal] act;]]

"2. That [name of third party]'s [intentional/criminal] conduct happened after the conduct of [name of defendant]; and

"3. That [name of defendant] did not know and could not have reasonably foreseen that another person would be likely to take advantage of the situation created by [name of defendant]'s conduct to commit this type of act."

The trial court instructed the jury with CACI No. 432, modified to identify the relevant third parties as Tawny and Paul Crouch, Jr. The trial court denied TCC's request to give CACI No. 433 and TCC's request to modify CACI No. 432 to include "other third parties."[6]

---

[6] TCC suggests the court erred by refusing to modify CACI No. 432 in this way. The version of CACI No. 432 given in this case was directed only to Carra's cause of action for negligent reporting. Because the jury found against Carra on that cause of action, TCC suffered no prejudice by the trial court's rejection of its proposed modification to CACI No. 432.

32

The trial court did not err by denying TCC's request to instruct with CACI No. 433 because, we conclude, TCC was not entitled to a superseding cause instruction for Carra's IIED cause of action. "[T]he defense of 'superseding cause[]' . . . absolves a tortfeasor, even though his conduct *was* a substantial contributing factor, when an independent event [subsequently] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9.)

California law accepts and follows the Restatement of Torts on the issue of superseding cause. (*Stewart v. Cox* (1961) 55 Cal.2d 857, 863-864.) On that subject, section 448 of the Restatement Second Torts states: "The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." Comment a to section 448 explains, "The rule stated in this Section applies when the actor's conduct creates a situation which is utilized by a third person to inflict intentional harm upon another or provides a temptation to do so." (Rest.2d Torts, § 448, com. a, p. 481.)

TCC's theory for being entitled to CACI No. 433 is "[t]here was substantial evidence of multiple causes of Carra's harm, including Smith, Tawny, Paul Crouch[, Jr.], and post-2006 rapists and sexual abusers." TCC argues that "[c]onsequently, the jury was allowed to hear evidence of post-April 24, 2006 criminal and tortious conduct, but not hold responsible all the respective perpetrators; and was permitted to assign disproportionate responsibility to Jan, and therefore [TCC], for such later events." TCC's argument amounts in large part to a concurrent/multiple causation or comparative fault

33

theory. The jury was instructed with CACI No. 430 that a substantial factor in causing harm "does not have to be the only cause of the harm." TCC stipulated to this instruction.

CACI No. 433 is neither a concurrent causation nor a comparative fault instruction allowing the jury to apportion relative degrees of fault. CACI No. 433, a superseding cause instruction, applies when a third party takes advantage of or utilizes a situation created by the tortfeasor's conduct to engage in intentional or criminal conduct inflicting harm on another person. (CACI No. 433; see Rest.2d Torts, § 448, com. a. p. 481.) TCC does not argue that any of the men who later raped or abused Carra did so by taking advantage of the situation created by Jan Crouch on April 24, 2006. That could not have been the case because those subsequent acts of abuse occurred long after Jan's conduct on April 24, 2006 by people who had no idea of anything Jan might have done or the situation she had created. For example, there was no evidence that a later abuser knew that Jan's conduct had placed Carra was in a damaged emotional state and took advantage of that damaged emotional state to intentionally harm Carra. CACI No. 433 simply did not fit this case.

Superseding cause *absolves* the tortfeasor of any and all liability. None of the conduct of the third parties identified by TCC could have been a superseding cause that would have completely absolved Jan Crouch—and through her, TCC—of liability for IIED. Carra suffered severe emotional distress immediately upon the April 24, 2006 meeting with Jan. The multiple/concurrent cause instruction dealt with later nonsuperseding causes of Carra's emotional distress. Even if those later abusers caused Carra emotional distress for which TCC was not responsible, TCC would still be liable for whatever emotional distress its intentional conduct was a substantial factor in causing.

Finally, to the extent the jury awarded Carra damages for which TCC was not legally responsible, the trial court corrected the problem by reducing her damages. The trial court granted TCC's motion for new trial based on excessive damages. The

34

court concluded the jury's award of $2 million must reflect the jury's finding as to the sum total of Carra's emotional distress damages from all sources. The court reduced the damages to $900,000 because that was the amount the court attributed to Jan's conduct on April 24, 2006. Thus, by granting the motion and reducing the damages, the court eliminated damages caused by superseding intervening causes from any source.

## DISPOSITION

The Amended Judgment, the order denying the motion for a JNOV, and the order denying the motion to vacate judgment are affirmed. Respondent to recover costs on appeal.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.